1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT

7          FOR THE DISTRICT OF ARIZONA

8

9    Tracy Dale Date,                    )    No. CV-07-368-PHX-MHM (LOA)
                                         )
10            Petitioner,                )    **REPORT AND RECOMMENDATION**
                                         )
11   vs.                                 )
                                         )
12   Dora B. Schriro, et al.             )
                                         )
13            Respondents.               )
                                         )
14   _____)

15          This matter arises on Petitioner's Petition for Writ of Habeas Corpus by Person in

16   State Custody Pursuant to 28 U.S.C. § 2254.  (docket # 1)  Respondents have filed an

17   Answer to which Petitioner has replied.  (dockets ## 13, 18, respectively)

18   **I. Factual and Procedural Background**

19          The following events gave rise to Petitioner's challenged convictions and sentences.

20          **A.  Factual Background, Charges, Trial and Sentence**

21          In May 2000, David Goldberg and Dennis Schilinski were prisoners in the Mohave

22   County Jail.  (Petitioner's Exh. C)  Robert Olsen, an inmate in the adjoining cell, befriended

23   with Goldberg.  (Respondents' Exh. FF: Tr. 1/10/01, at 86–87, 89–91)  Goldberg was a

24   co-defendant with Eugene Cofsky and his wife Sheri Cofsky in another case. (Respondents'

25   Exh. GG: Tr. 1/11/06, at 139; Exh. JJ: Tr. 1/18/01, at 86; Exh. K: Tr. 1/19/01, at 67–68)  The

26   Cofskys, however, were out on bond.  Olsen repeatedly overheard Goldberg discussing a

27   plan to break out of jail. (Respondents' Exh. FF at 91, 107)  The plan involved intercepting

28   Goldberg while he was being returned to jail following his court appearance scheduled

1  before Judge Steven F. Conn at 11:30 a.m. on June 12, 2000 at Mojave County Superior

2  Court in Kingman, Arizona.[1]

3  　　　According to the plan, Goldberg would be picked up in a van with sliding doors so

4  that Goldberg, who would be chained, could "hop in." (*Id.* at 103–04, 113–14, 163–64)

5  Once inside the van, Goldberg would "cut off his chains," "change his clothes," and then

6  drive to a Carl's Jr. restaurant, where another car was "waiting," and "switch" vehicles. (*Id.*)

7  Goldberg would then drive to Lake Havasu, "hide there for a week to two weeks" at a public

8  campground, then travel to Mexico and ultimately Australia. (*Id.*)

9  　　　The plan included a contingency that if the guard who was escorting Goldberg

10  attempted to block the escape, Dennis Schilinski would "kill the guard" by "shoot[ing]" him.

11  (*Id.* at 93–94, 97, 130)  In exchange, Schilinski would receive "a large sum of money."  (*Id.*

12  at 130)  Goldberg also told Olsen that several others were involved in the plan, including

13  "Gene [Cofsky], Ron [Manning], [and] Gene's wife [Sheri Cofsky]." (*Id.* at 99)  Goldberg

14  told Olsen that "Gene" or "Eugene" Cofsky was his "business partner and friend." (*Id.* at 99-

15  100)  Goldberg discussed his plan with Olsen on a "daily basis," between "30 and 60 times."

16  (*Id.* at 94, 98–99, 107)

17  　　　Olsen initially thought that Goldberg was "bragging," but as "days went on" Olsen

18  realized that the plan was "very serious." (*Id.* at 94, 98)  Concerned that the conspirators

19  were "going to kill a guard" during the escape attempt, Olsen wrote a letter to his drug

20  therapy counselor describing Goldberg's plan.  (*Id.* at 104–09, 120–24, 164) About a week

21  before the planned escape attempt, Schilinski was transported to the Clark County Detention

22  Center in Las Vegas, Nevada, where he had outstanding traffic warrants.  (Respondents'

23  Exh. FF at 102; Exh. GG at 7–12)  Goldberg told Olsen that "Gene" Cofsky had paid

24

25

26  　[1]  The courthouse was across the street from the jail, and inmates would walk to and from the courthouse for court appearances, escorted by one correction officer. (Respondents' Exh. FF

27  at 199–204).

28

1   Schilinski's fines and taken him to his ranch, where he would stay until the jailbreak.

2   (Respondents' Exh. FF at 103) Goldberg explained that they "didn't want to lose track of

3   [Schilinski] because he was a key figure in this." (*Id.*)

4          Meanwhile, after Schilinski was transported to the Clark County Detention Center in

5   Las Vegas, but before Cofsky had paid his fines to get him released, Schilinski told fellow

6   inmate Daniel England about the planned escape attempt.  (Respondents' Exh. GG at 7–13)

7   Specifically, Schilinski told England that he had to "go break somebody out of jail" on

8   "Monday at 11:30 on the 12th of June," just five days away, and to "watch the six o'clock

9   news" that day. (*Id.* at 11, 13–15) Schilinski also told England that the person's name was

10  "Dave"Goldberg. (*Id.*)   Schilinski explained that a van with "two" people in it was going to

11  pull over and "grab" Goldberg as he was being transported "from the court back to the jail"

12  in Kingman. (Respondents' Exh. GG at 16–19, 31, 33, 54–55, 69, 81–82, 91, 94) Schilinski

13  was going to tell the guard, "don't be a cowboy," and if he did anything or "made a move,"

14  he was going to "shoot him." (*Id.* 17, 54)  Then they planned to "switch cars," and

15  eventually travel to Australia. (*Id.* at 17-19) A person named "Eugene" (Cofsky) was

16  responsible for the "placement of the vehicles." (*Id.*) Schilinski told England that Goldberg

17  was going to pay him $150,000 for his participation. (*Id.* at 18)  England alerted Las Vegas

18  Police about the planned escape attempt. (*Id.* at 21–26)

19         On June 8, 2000, the Las Vegas Police Department contacted the Mohave County

20  Detention Center and advised officials there of the planned jailbreak, including the names of

21  several of the known conspirators— (1) "Dave" (Goldberg); (2) "Schilinski"; (3) "Eugene,"

22  with a last name that "ended in a "ski-sounding word" (Eugene Cofsky); and (4) "Cheryl"

23  (Sheri Cofsky).  (Respondents' Exh. GG at 90–93, 98, 134–41)  Mohave County jail

24  officials verified Goldberg's status as an inmate at the jail and that he had an upcoming court

25  appearance scheduled for June 12, 2000 at 11:30 a.m. at the Mohave County Courthouse.

26  (*Id.*) They also verified Schilinski's status as a former inmate and his relationship with

27  Goldberg.  (Respondents' Exh. GG at 140-44)  Officials discovered that Eugene and Sheri

28  Cofsky were identified as codefendants in Goldberg's case. (*Id.*) After obtaining the

1  foregoing information, Mojave County Jail officials contacted the Mohave County Sheriff's

2  Department.  (Respondents' Exh. GG at 134-41)

3        That weekend, the Mohave County Sheriff's Deparment, the Federal Bureau of

4  Investigation, and the Arizona Department of Public Safety, set up surveillance at the

5  Cofsky residence, approximately 13 miles outside of Kingman, and throughout Kingman's

6  city limits, particularly the Mohave County Courthouse and the Mohave County Detention

7  Center. (Respondents' Exh. GG at 173–79; Exh. HH: Tr. 1/12/01, at 6–7, 16, 125–30,

8  138–40; Exh. II: Tr. 1/17/01, at 17–24, 117–19, 234–37; Exh. JJ at 13–17, 49–59) At

9  approximately 6:00 p.m. on June 11, 2000, officers saw Petitioner and co-defendant,

10  Tawanee Barrett,[2] arrive together at the Cofsky residence in a black Mercury Mountaineer.

11  (Exh. HH at 130–35; Exh. KK at 56–58; Exh. LL: Tr. 1/23/01, at 4–7) Officers also noticed

12  a silver-blue Dodge Caravan minivan parked at the residence. (Exh. JJ at 58)

13        The next morning, at approximately 9:00 a.m., Eugene and Sheri Cofsky arrived at

14  the Cofsky residence in a red pickup truck.  (Respondents' Exh. GG at 180; Exh. HH at 149;

15  Exh. LL at 21)  At around 10:00 a.m., officers observed Petitioner, Barrett, and co-defendant

16  Ronald Manning leave the Cofsky residence in the Mountaineer and drive to a Wal-Mart

17  store in Kingman. (Respondents' Exh. HH at 143–49,167–70; Exh. II at 245–48; Exh. JJ at

18  19–23; Exh. LL at 22–25)  Petitioner, Barrett, and Manning purchased .38 caliber

19  ammunition at Wal-Mart. (Respondents' Exh. HH at 167-70; Exh. LL at 22-25)  The three

20  then drove to Auto Zone and bought a pair of 18-inch bolt cutters. (*Id.*) They then returned

21  to the Cofsky residence. (*Id.*)

22        At approximately 11:00 a.m., officers observed all three vehicles—the pickup truck,

23  the minivan, and the Mountaineer—leave the Cofsky residence and drive to Kingman.

24  (Respondents' Exh. GG at 185–90, 194; Exh. HH at 150–53, 177) Petitioner and Barrett

25  were driving the Mountaineer, Manning was driving the minivan, and the Cofskys were

26  driving the pickup truck. (Respondents' Exh. LL at 29–30, 45–46)  Officers followed the

27   

28       [2] Petitioner testified that Barrett was his fiancee.  (Respondents' Exh. LL at 5)

- 4 -

1  vehicles into Kingman, and watched them drive to an old warehouse parking lot.

2  (Respondents' Exh.  HH at 154–55; Exh. LL at 30) At the warehouse parking lot, Petitioner

3  and Manning removed the minivan's back seat and left it behind the building. (Respondents'

4  Exh. GG at 195; Exh. LL at 30) Petitioner, Barrett, and Manning then drove to a parking lot

5  at Arnold Plaza where Barrett backed the Mountaineer into a parking space and parked.

6  (Respondents' Exh. GG at 161-63; Exh. LL at 30-31) Barrett stayed in the Mountaineer.

7  Petitioner and Manning left in the minivan and headed towards the courthouse.

8  (Respondents' Exh. II at 118-19, 125-26; Exh. JJ at 59-64;Exh. LL at 30-31)  Meanwhile,

9  the Cofskys drove to the courthouse and parked on the street in front of the courthouse.

10  (Respondents' Exh. HH at 30) Around this same time, officers observed Schilinski arrive in

11  a white Pontiac Trans Am[3] and park in a parking lot located between the courthouse and the

12  jail.  (Respondents' Exh. II at 25-31, 238-41; Exh. JJ at 61-62) Schilinski exited the vehicle,

13  and began "looking all about, up and down the street in all different directions" in a

14  "paranoid fashion." (*Id.*) Schilinski then walked around the

15  courthouse, got back into the Trans Am, and drove away.  (Respondents' Exh. II at 240)

16  Schilinski returned "[s]everal minutes later," parked in the same parking lot, and went inside

17  the jail's administration office.  (*Id.* at 240-41)  Schilinski then returned to his vehicle and

18  left. (*Id.*)  Shortly thereafter, officers saw Schilinski return to the courthouse, still "very,

19  very nervous, looking around," and "scanning the area." (Respondents' Exh. II at 120-24;

20  Exh. JJ at 61-62)  Schilinski entered the courthouse, "rushed through" the security

21  checkpoint, and walked towards the elevators. (Respondents' Exh. HH at 18-25) An

22  undercover officer followed Schilinski and got on the elevator with him. (*Id.* at 19)

23  Schilinski "blurted out . . . they don't like it when you're late," and stated that he was

24  expected in court. (*Id.*)  The officer asked Schilinski which courtroom he was looking for,

25  and Schilinski told him, "Judge Conn's courtroom." (*Id.* at 19-21)  Schilinski then asked the

26

27      [3]  The white Trans Am had been reported stolen earlier that morning in Laughlin, Nevada.

28  (Respondents' Exh. II at 72-73).

1   officer if he was a "cop." (Respondents' Exh. HH at 20)  The officer identified himself as a

2   police officer and asked Schilinski his name. (*Id.*)  Schilinski replied, "Dave Hausen." (Id.)

3   Once at Judge Conn's courtroom, Schilinski approached the doors, "leafed through the court

4   calendar," and then left. (*Id.* at 21-22) The undercover officer then looked at the court

5   calendar, and noticed that Goldberg was scheduled to appear before Judge Conn at 11:30

6   a.m. (*Id.* at 22-23)  Schilinski's name was not on the calendar. (*Id.* at 22)  After Schilinski

7   left the courthouse, the undercover officer observed the Cofskys enter the courthouse and

8   proceed to Judge Conn's courtroom. (*Id.* at 25-29, 74-75) Several minutes later, Eugene

9   Cofsky left the courtroom, made a brief phone call on a nearby pay phone, and then

10  reentered the courtroom.  (Respondents' Exh. HH at 27-29)  Both Eugene and Sheri Cofsky

11  then left the courtroom, and walked out of the courthouse, where they were immediately

12  arrested. (*Id.*) Police discovered $10,700 in Eugene Cofsky's pants pocket. (*Id.* at 31)  Police

13  also found a day planner in Sheri Cofsky's purse that contained Schilinski's name, social

14  security number, and date of birth, Manning's name and phone number, and the name,

15  "Tracy" (Petitioner), with a corresponding telephone number. (*Id.* at 31–35)  Officers

16  searched the Cofsky's pickup truck parked outside the courthouse, and found a set of

17  California license plates, which were not registered to the Cofskys.  (Respondents' Exh. II at

18  181–83, 190)  Police subsequently found Schilinski and arrested him.  (Respondents' Exh.

19  JJ at 68–69)  Meanwhile, officers outside the courthouse observed the silver-blue minivan

20  drive "right in front" of the courthouse. (Respondents' Exh. GG at 160-61, 193-94; Exh. II

21  at 125-29; Exh. JJ at 62-65)  Believing the conspirators "were going to be carrying out their

22  plan," officers stopped the minivan, and ordered Petitioner and Manning to exit the vehicle.

23  (Respondents' Exh. GG at 160-61, 167; Exh. II at 125-32, 242-43; Exh. JJ at 62-69)

24  Manning was in the driver's seat, and Petitioner was crouched in the "back cargo area" of

25  the van. (Respondents' Exh. II at 129-32, 244; Exh. JJ at 66) Petitioner was wearing

26  "reflective sunglasses," had seven .38 caliber rounds of ammunition in his pocket, and was

27  holding six more rounds in his hand. (Respondents' Exh. II at 41-42, 131; Exh. JJ at 66)

28  Officers discovered two handguns in the van, one loaded with two .38 caliber rounds of

1    ammunition, and a pair of worn surgical gloves. (Respondents' Exh. II at 132-35, 172-81;

2    Exh. JJ at 67) Police arrested Petitioner and Manning and took them into custody.

3    (Respondents' Exh. II at 133, 244; Exh. JJ at 11)  Officers then stopped the Mountaineer

4    that was still parked at Arnold Plaza, and arrested Barrett. (Respondents' Exh. GG at 161-

5    67; Exh. HH at 157)  Inside the Mountaineer, officers discovered: (1) two pairs of bolt

6    cutters; (2) five .38 caliber rounds of ammunition; (3) a pair of plastic gloves similar to the

7    pair found in the minivan; (4) a bag containing "extra large" men's clothing and a can of

8    shaving cream;[4] (5) cell phones; (6) two license plates; and (7) a court document bearing

9    Eugene Cofsky's name.  (Respondents' Exh. II at 143-162, 223; Exh. JJ at 70-73, 87) The

10   Nevada license plate on the back of the Mountaineer was covered with a California license

11   plate that was not registered to any of the conspirators. (Respondents' Exh. II at 142,144-45,

12   188-191) Officers also searched the Cofsky residence and found: (1) $117,500 in cash; (2) a

13   document bearing Eugene Cofsky's name which included the notation,"left Fourth, end,

14   park van, white Grand Am"; (3) .38 caliber shell casings; and (4) a receipt from Wal-Mart

15   for .38 caliber ammunition purchased on June 12, 2000 at 10:20 a.m. (Respondents' Exh.

16   GG at 196–98; Exh. HH at 37–41, 161–70) A telephone calling card taken from Schilinski

17   after his arrest indicated that he called the Cofsky residence at 8:28 a.m. on June 12, 2000.

18   (Respondents' Exh. HH at 166)

19        Following his arrest, Manning waived his *Miranda* rights and agreed to be

20   interviewed by police. (Respondents' Exh. II at 33–38)  Initially, Manning denied

21   knowledge of a plan to break Goldberg out of jail, but eventually admitted that he had

22   "heard discussion about a plan to break Goldberg out of jail," involving a person named

23   "Dennis" (Schilinski). (*Id.*)  Manning admitted removing the minivan's back seat, but

24   claimed that he did so because he was picking up "building supplies." (*Id.*)

25

26

27        [4]  Goldberg weighed approximately 260 pounds and had a beard.  (Respondents' Exh. JJ at

28   73)

1    Petitioner also waived his *Miranda* rights and agreed to talk with police.

2    (Respondents' Exh. II at 40–47; Exh. JJ at 30–33) Petitioner told police that he had driven

3    to Kingman with his girlfriend, Barrett, from Utah that weekend to meet Manning,

4    whom he had known for a "couple of years." (Respondents' Exh. II at 40-47; Exh. JJ at 30-

5    33) Petitioner admitted that: (1) he had been at the Cofsky's residence earlier that morning;

6    (2) he helped Manning remove the back seat of the minivan; (3) the ammunition found in his

7    pocket was the same ammunition loaded in the handgun that was found in the minivan; and

8    (4) he "handled" at least one of the two handguns found in the minivan. (Respondents' Exh.

9    JJ at 30-33) When asked why he and Manning removed the seat from the van, Petitioner

10   became "upset and agitated" and "no longer wanted to speak after that." (*Id.*) Petitioner

11   denied any involvement in the conspiracy. (*Id.*)

12   Based on the foregoing events, on June 22, 2000, the State of Arizona filed an

13   indictment in Mojave County Superior Court, charging Petitioner and each of his five co-

14   defendants (Schilinski, Eugene and Sheri Cofsky, Manning, and Barrett) with one count of

15   conspiracy to commit first degree murder, a class 1 felony (Count 1), and one count of

16   conspiracy to commit first degree escape, a class 4 felony (Count 2). Petitioner was also

17   charged with one count of theft of a gun, a class 6 felony (Count IV). (Respondents' Exh.

18   A)

19   Petitioner and codefendants Eugene Cofsky, Sheri Cofsky, and Manning were tried

20   together before the Honorable Steven F. Conn. (Respondents' Exh. B: Minute Entry, dated

21   1/9/01) On the first day of trial, Petitioner filed a *pro se* motion for change of judge

22   pursuant to Ariz.R.Crim.P. 10.1 claiming that "Judge Steven Conn has been mentioned by

23   name alleging some unwilling participation." (Petitioner's Exh. P) The court denied the

24   motion as untimely and noted that the motion was "so vague as to defy being able to be

25   addressed in any way." (Petitioner's Exh. Q)

26   During trial, Petitioner testified that he and Barrett had traveled to the Cofsky

27   residence to do construction work with Manning. (Respondents' Exh. LL at 3-7, 47)

28   Petitioner stated that he was going to help with a septic system and mentioned that the

1    Cofskys were digging a pool.  (Respondents' Exh. LL at 48) Petitioner testified that around
2    3:00 a.m. on June 12, 2000, he and Barrett drove to Wal-Mart to steal tools by hiding them
3    in suitcases.  (Respondents' Exh. LL at 13-17) He testified that he placed the suitcases
4    containing tools by an emergency exit but he abandoned the tools because Barrett did not
5    want to be involved.  (Respondents' Exh. LL at 16-18)  He further testified that he covered
6    the Nevada license plate on his Mountaineer with a California plate.  (Respondents' Exh. LL
7    at 16-18, 36) Petitioner and Barrett returned to the Cofsky's ranch around 7:00 a.m.
8    (Respondents' Exh. LL at 18-23) At around 10:00 or 11:00 a.m., Petitioner, Manning and
9    Barrett went back to Wal-Mart to retrieve the tools.  (Respondents' Exh. LL at 22) Petitioner
10   testified that they split up once they arrived at Wal-Mart and that Manning purchased
11   ammunition.  (Respondents' Exh. LL at 23, 35) Petitioner testified that he did not retrieve
12   the previously abandoned tools.  (Respondents' Exh. LL at 23) Petitioner testified that they
13   proceeded to Auto Zone and purchased bolt cutters needed to make a fence and to "wire all
14   the rebar" for the pool that was being installed.  (Respondents' Exh. LL at 24-25, 35)
15   Thereafter, they returned to the Cofsky's residence.  (Respondents' Exh. LL at 23-25)

16          Petitioner stated that he subsequently realized he was not going to get paid for the
17   work he had done, so he stole two revolvers from the residence and hid them in the van.
18   (Respondents' Exh. LL at 10, 19-21, 26-28)  He denied any knowledge of the planned
19   escape.  Petitioner acknowledged his post-arrest statement to police that he had helped
20   remove the van's rear seat but explained that he and Manning needed space to pick up
21   construction materials.  (Respondents' Exh. LL at 25-28) He also explained that he was in
22   the area of the courthouse because he and Manning were on their way to a nearby
23   elementary school to steal bicycles to "fence." (*Id.* at 11, 27-28, 30-32)  He also testified
24   that the bolt cutters would be used to steal the bikes.  (*Id.*)

25          On January 26, 2001, a jury found Petitioner guilty of conspiracy to commit first
26   degree murder (Count 1) and conspiracy to commit first degree escape (Count 2), but
27   acquitted him of theft (Count 4). (Respondents' Exh. C: Minute Entry, dated 1/26/01)  On
28   April 6, 2001, the trial court sentenced Petitioner to life imprisonment with the possibility of

1   parole after serving 25 calendar years on Count 1. (Respondents' Exh. NN: Tr. 4/6/01, at

2   11–12) The court also imposed an aggravated term of 7 years' imprisonment on Count 2, but

3   noted that one of the sentences must be vacated on appellate review, pursuant to A.R.S. §

4   13–1003(C). (*Id.* at 12–14) The court explained that, although under A.R.S. § 13-1003(C),

5   Petitioner could not properly be sentenced for both conspiracy to commit murder and

6   conspiracy to commit escape in this case, the court would impose appropriate sentences on

7   each count of conviction so the Court of Appeals would not have remand for resentencing if

8   it vacated one of Petitioner's counts of conviction. (Respondents' Exh. NN at 12-13)

9        **B. Direct Appeal**

10       Petitioner, through counsel, filed a timely notice of direct appeal. (Respondents' Exh.

11  D) In his opening brief, Petitioner raised the following claims:

12       (1) The trial judge's failure to recuse himself violated the Arizona Rules of
         Criminal Procedure, the Rules of Judicial Conduct, and Petitioner's Fourteenth
13       Amendment rights.

14       (2) The admission of non-conspirator England's testimony repeating Schilinski's
         account of the conspiracy violated the Arizona Rules of Evidence and Petitioner's
15       Fifth, Sixth and Fourteenth Amendment rights.

16       (3) The trial court erred in permitting Officer Coleman to refresh his
         memory regarding surveillance times, pursuant to Arizona Rule of Evidence
17       803(5), by reading from the surveillance log because no foundation existed.

18       (4) The admission of the Wal-Mart (ammunition) and Auto Zone (bolt cutters)
         receipts violated the Arizona Rules of Evidence and Petitioner's Fourteenth
19       Amendment rights.

20       (5) The admission of England's testimony that Goldberg was a member of the
         Aryan Brotherhood violated Arizona Rule of Evidence 403 and Petitioner's
21       Fourteenth Amendment rights.

22       (6) Testimony that Goldberg possessed $75,000 in unexplained currency violated
         Arizona Rule of Evidence 403 and Petitioner's Fourteenth Amendment rights.
23

24       (7) The evidence was insufficient to prove beyond a reasonable doubt that
         Petitioner had the specific intent to kill, as required for conspiracy to commit
         first degree murder, in violation of Petitioner's Fourteenth Amendment rights.
25

26       (8) The indictment was multiplicitous because it charged a single conspiracy in
         two counts in violation of the Fifth Amendment. [Ground V in pending petition]

27       (9) Sentencing Petitioner on both conspiracy to commit first-degree murder and
         conspiracy to commit first-degree escape violated A.R.S. 13–1003(C) and the
28       Fifth Amendment.

(10) The trial court's denial of Petitioner's motion to continue trial to secure trial witnesses violated his Fifth, Sixth and Fourteenth Amendment rights.

(11) The trial court's denial of Petitioner's motion to vacate judgment violated his right to compulsory process guaranteed by the Fifth, Sixth and Fourteenth Amendments.

(Respondents' Exh. E)

On January 28, 2002, Petitioner filed a motion for leave to file a supplemental brief which the appellate court granted. (Respondents' Exhs. F, G) On February 13, 2002, Petitioner filed a supplemental brief raising the following issue, his twelfth ground for relief:

(12) The trial court erred in refusing to sever Petitioner's trial from the trial of co-defendants Manning and Eugene Cofsky because of the admission of a letter written by Manning to Cofsky which implicated Petitioner, in violation of the Sixth and Fourteenth Amendments, and Article 2, § 24 of the Arizona Constitution.

(Respondents' Exh. H) On April 29, 2002, Petitioner requested leave to file a second supplemental brief. (Respondents' Exh. I) On May 3, 2002, the appellate court granted this request, and allowed Petitioner until May 20, 2002 in which to file the second supplemental brief. (Respondents' Exh. J; Petitioner's Exh. B) On May 20, 2002, Petitioner filed a second supplemental brief raising his thirteenth issue on appeal— the trial court abused its discretion in failing to grant Petitioner's motion to suppress because the police lacked probable cause to arrest him. (Respondents' Exh. K; Petitioner's Exh. 11)

On August 15, 2002, the Arizona Court of Appeals rejected all but one of Petitioner's claims. (Respondents' Exh. L; Petitioner's Exh. C) The appellate court agreed with Petitioner that the indictment was multiplicitous because it charged a single conspiracy in two counts, in violation of Arizona Revised Statute § 13–1003(C).[5] (*Id.* at 18–19) The court found that there was only one conspiracy and "that the most serious offense conspired to was first-degree murder." (Respondents' Exh. L at 19; Petitioner's Exh. C at 19) Accordingly, the appellate court affirmed Petitioner's conviction and sentence for

---

[5] A.R.S. § 13–1003(C) (2001), states: "A person who conspires to commit a number of offenses is guilty of only one conspiracy if the multiple offenses are the object of the same agreement or relationship and the degree of the conspiracy shall be determined by the most serious offense conspired to."

conspiracy to commit first degree murder, and vacated Petitioner's conviction and sentence for conspiracy to commit escape, the less serious of the two convictions. (*Id.* at 19, 22.) The court noted that "[t]his action eliminates any prejudice defendant suffered from being convicted more than once for a single conspiracy and, consequently, this is the only relief to which defendant is entitled." (*Id.* at 19)

On September 16, 2002, Petitioner filed a petition for review in the Arizona Supreme Court raising issues involving sufficiency of the evidence (specific intent), the motion to suppress (probable cause to arrest), recusal of trial judge, the motion to sever (Manning letter), the multiplicitous indictment, and admission of sales receipts from Wal-Mart and Auto Zone. (*Id.*)  On February 11, 2003, the Arizona Supreme Court denied review without comment.  (Respondents' Exh. N; Petitioner's Exh. E)

**C. Post-Conviction Review**

On March 12, 2003, Petitioner filed a notice of post-conviction relief. (Respondents' Exh. O) The court appointed counsel and in the subsequently filed petition for post-conviction relief, Petitioner raised the following claims:

A.  The holding in *Evanchyck v. Stewart*, 47 P.3d 1114 (Ariz. 2002), that conspiracy to commit first degree murder is a specific intent crime represents a significant change in the law that, if applicable to Petitioner's case, would probably overturn his conviction.

B.  Trial counsel was ineffective based on the following grounds:

1. For failing to timely request a change of judge;

2. For failing to file a pre-trial motion to dismiss the multiplicitous indictment;

3. For failing to object to the admission of co-conspirator Schilinski's statements elicited through the testimony of witnesses Olsen and England because there was no evidence Petitioner was a member of the conspiracy;

4. For erroneously advising Petitioner that (1) his co-conspirator's statements could not be used to establish their contingency plan to kill a guard, and (2) that conspiracy to commit first degree murder could not be found based on conditional intent;

5. For failing to conduct adequate pretrial investigation;

6. For failing to request a proper instruction under *Richardson v. Marsh*, 481 U.S. 200 (1987), regarding the Manning letter;

7. For failing to object to certain evidence at trial; and

8. For failing to request instructions on lesser-included offenses (conspiracy to commit aggravated assault, facilitation, or solicitation), an instruction that conspiracy to commit first degree murder requires the specific intent to commit murder, and a cautionary instruction regarding the pervasive police presence around the courthouse.

C.  Appellate counsel was ineffective for the following reasons:

1. For failing to present facts, authority, and argument in the appellate brief regarding the trial judge's failure to recuse himself;

2. For omitting from the record on appeal transcripts of the hearing on co-defendant Sheri Cofsky's motion to preclude England's testimony regarding co-conspirator Schilinski's statements and for failing to argue that the condition precedent for admission of those statements did not exist;

3. For failing to present facts indicative of evidence adduced at trial that the Manning letter implicated Petitioner;

4. For failing to present facts and argument regarding why the trial court abused its discretion in denying Petitioner's motion to continue;

5. For failing to timely raise the issue of probable cause for Petitioner's arrest;

6. For failing to present facts and argument regarding the extent to which the multiplicitous indictment prejudiced Petitioner; and

7. For failing to file a motion to reconsider in the Court of Appeals based on *Evanchyck*.

(Respondents' Exh. P)

On September 29, 2004, Petitioner filed a supplemental petition for post-conviction relief, arguing that trial counsel was ineffective for failing to obtain evidence demonstrating that Petitioner was not a member of the conspiracy and for failing to submit such evidence to the trial court before it ruled on the motion *in limine* to preclude Schilinski's statements. (Respondents' Exh Q; Petitioner's Exh. 6)  Petitioner also argued that appellate counsel was ineffective for omitting from the record on appeal a transcript of the January, 2001 hearing in which the trial court ruled on a similar motion *in limine* filed by co-defendant Sheri Cofsky.  (Respondents' Exh. Q at 2-3)  Petitioner argued that had the transcript been prepared, it would have been "apparent" that there was no evidence that Petitioner was a member of the conspiracy. (*Id.*)

1  On January 7, 2005, the trial court denied Petitioner's petition for post-conviction

2  relief finding that Petitioner "failed to present any claim raising a material issue of fact or

3  law which would entitle him to relief under Rule 32," and that there was "no colorable claim

4  for relief justifying the setting of an evidentiary hearing." (Respondents' Exh. R)

5  Thereafter, Petitioner filed a petition for review from the trial court's denial

6  of post-conviction relief in the Arizona Court of Appeals. (Respondents' Exh. S)  Petitioner

7  again argued that *Evanchyck* constituted a significant change in the law which, if applied to

8  his case, would probably have changed the outcome. (*Id.*) Petitioner also argued that counsel

9  was ineffective based on his failure (1) to timely request a change of judge under

10 Ariz.R.Crim.P. 10.1, (2) to move to dismiss the multiplicitous indictment prior to trial, (3) to

11 object to the admission of Schilinski's statements, (4) to accurately advise Petitioner before

12 rejecting the State's plea offer that he could be convicted of conspiracy to commit first

13 degree murder based on conditional intent, (5) to interview witnesses prior to trial, (6) to

14 request an adequate instruction under *Richardson v. Marsh*, 481 U.S. 200 (1987), (7) to

15 request an instruction on the lesser-included offense of conspiracy to commit aggravated

16 assault, and (8) to object to Officer McNally's testimony that a "7" looked like a "T" in the

17 Manning letter.  (*Id.*)  Petitioner did not raise his previously asserted claims that trial counsel

18 was ineffective for (1) advising him prior to rejecting the State's plea offer that his

19 co-conspirator's statements could not be admitted to show their plan to kill a guard if

20 necessary, (2) failing to request instructions on the lesser-included offenses of facilitation

21 and solicitation, an instruction that conspiracy to commit first degree murder requires a

22 specific intent to commit murder, and a cautionary instruction regarding the pervasive police

23 presence around the courthouse, and (3) failing to make any other evidentiary objections at

24 trial. (*Id.*)

25 Petitioner also asserted claims of ineffective assistance of appellate counsel based on

26 counsel's failure (1) to timely raise the issue that the trial court erred in denying Petitioner's

27 motion to suppress because police lacked probable cause to arrest him, and (2) to include in

28 the record on appeal a transcript of the January 3, 2001 hearing on co-defendant Sheri

1   Cofsky's motion to preclude Schilinski's statements. (Respondents' Exh. S at 2-3)

2   Petitioner did not raise any other claims of ineffective assistance of appellate counsel. (*Id.*)

3   On November 10, 2005, the Arizona Court of Appeals denied review without

4   comment. (Respondents' Exh. T; Petitioner's Exh. 13)  On December 10, 2005, Petitioner

5   filed a petition for review in the Arizona Supreme Court raising the same claims he had

6   raised in his petition for review to the Arizona Court of Appeals.  (Respondents' Exh. U)

7   The Arizona Supreme Court denied review without comment on May 23, 2006.

8   (Respondents' Exh. V; Petitioner's Exh. 14)

9   **D.  Federal Petition for Writ of Habeas Corpus**

10   Thereafter, Petitioner timely filed the instant Petition for Writ of Habeas Corpus

11   raising 24 claims for relief.  (docket # 1)  Respondents assert that all but two of these

12   claims, Grounds IV and XI(A), are procedurally defaulted and barred from federal review

13   because (1) Petitioner did not "fairly present" the federal constitutional claims "in each

14   appropriate state court," and/or the state courts imposed a procedural bar to avoid reaching

15   the merits; (2) a return to state court to present those claims would be futile because the

16   state courts would find all of these claims procedurally barred; and (3) Petitioner has not

17   established either "cause and prejudice" or a "fundamental miscarriage of justice" to excuse

18   his failure to properly present these claims to the state courts.  (docket # 13 at 17)  Thus,

19   Respondents assert that the Court should deny relief.  Respondents further assert that the

20   claims raised in Grounds IV and XI(A) lack merit.  Petitioner disputes these assertions.

21   (docket # 18) The Court will discuss the law regarding exhaustion, procedural bar, and the

22   standard of review and will then apply that law to Petitioner's claims.

23   **II.  Exhaustion and Procedural Bar**

24   A federal court may not grant a petition for writ of habeas corpus unless the

25   petitioner has exhausted the state remedies available to him.  28 U.S.C. § 2254(b).  When

26   seeking habeas relief, petitioner bears the burden of showing that he has properly exhausted

27   each claim.  *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981)(*per curiam*). The

28   exhaustion inquiry focuses on the availability of state remedies at the time the petition for

1 writ of habeas corpus is filed in federal court. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

2 The prisoner "shall not be deemed to have exhausted . . . if he has the right under the law of

3 the State to raise, by any available procedure, the question presented." 28 U.S.C. §

4 2254(c). In other words, proper exhaustion requires the prisoner to "give the state courts

5 one full opportunity to resolve any constitutional issues by invoking one complete round of

6 the State's established appellate review process." *O'Sullivan*, 526 U.S. 845. "One complete

7 round" includes filing a "petition[] for discretionary review when that review is part of the

8 ordinary appellate review procedure in the State." *Id.* State prisoners may skip a

9 procedure occasionally employed by a state's courts to provide relief only if a state law or

10 rule precludes use of the procedure, or the "State has identified the procedure as outside the

11 standard review process and has plainly said that it need not be sought for purposes of

12 exhaustion. *Id.* at 848, 850.

13 In this case, Respondents argue that because Petitioner, who received a sentence of

14 life imprisonment, did not present several of his federal claims to the Arizona Supreme

15 Court, those claims are unexhausted. Petitioner, on the other hand, argues that he properly

16 exhausted his claims by presenting them to the Arizona Court of Appeals and that he was

17 not required to seek review in the Arizona Supreme Court. (docket # 18) As discussed

18 below, the Court agrees with Petitioner that he was not required to present his claims to the

19 Arizona Supreme Court to satisfy the exhaustion requirement. Although the Court

20 concludes that the exhaustion requirement did not require Petitioner to present his federal

21 claims to the Arizona Supreme Court, he was still required to fairly present his claims to

22 the Arizona Court of Appeals.

23 **A. Proper Forum**

24 To exhaust state remedies, a petitioner must afford the state courts the opportunity to

25 rule upon the merits of his federal claims by "fairly presenting" them to the state's

26 "highest" court in a procedurally appropriate manner. *Castille v. Peoples*, 489 U.S. 346,

27 349 (1989); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (stating that "[t]o provide the State

28 with the necessary 'opportunity,' the prisoner must "fairly present" her claim in each

1    appropriate state court . . . thereby alerting the court to the federal nature of the claim.").

2    Contrary to Respondents' assertion, in Arizona, unless a prisoner has been sentenced to

3    death, the "highest court" requirement is satisfied if the petitioner has presented his federal

4    claim to the Arizona Court of Appeals either on direct appeal or in a petition for post-

5    conviction relief.  *Crowell v. Knowles* , 483 F.Supp.2d 925 (D.Ariz. 2007)(discussing

6    *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999)).

7         Relying on *Swoopes v. Sublett*, 196 F.3d 1008 (9th Cir. 1999) and *Baldwin v. Reese*,

8    541 U.S. 27 (2004), Respondents argue that to properly exhaust federal claims, a Petitioner,

9    who received a life sentence is required to present those claims to the Arizona Supreme

10   Court.  (docket # 13)  *Swoopes* does not support this assertion.  Although less than a life

11   sentence had been imposed in *Swoopes*, the Ninth Circuit broadly stated that "Arizona state

12   prisoners need not appeal an Arizona Court of Appeals' denial of post-conviction relief to

13   the Arizona Supreme Court in order to exhaust their state remedies for federal habeas

14   corpus purposes, except in capital cases or cases involving the imposition of a life

15   sentence." 196 F.3d at 1008.  In support of this conclusion, *Swoopes* included undated

16   citations to A.R.S. §§ 120.21(A)(1), 12-120.24, and 13-4031, and citations to

17   Ariz.R.Crim.P. 31, *State v. Shattuck*, 140 Ariz. 582, 684 P.2d 154 (1984), *State v. Sandon*,

18   161 Ariz. 157, 777 P.2d 220 (1989), and *Moreno v. Gonzalez*, 192 Ariz. 131, 962 P.2d 205

19   (1989).  *Swoopes*, 196 F.3d at 1009-10.  As the court noted in *Crowell v. Knowles*, 483

20   F.Supp.2d 925, 930 (D.Ariz. 2007), "none of those authorities — either at the time of

21   *Swoopes* or now — support the proposition that Arizona Supreme Court review remains

22   part of the standard review process necessary for exhaustion in cases carrying *life*

23   *sentences*.  *Id*. (emphasis in original).  Rather, to the extent those authorities mentioned life

24   imprisonment, it was in reference to outdated versions of A.R.S. § 12-201.21(A)(1) and 13-

25   4031.  In 1989, years before *Swoopes* was decided, A.R.S. § 12-120.21(A)(1) and § 13-

26   4031 were amended to omit the phrase, "or life imprisonment."  "The effect of this change

27   was to give the Arizona Court of Appeals jurisdiction over criminal convictions carrying

28

1   life sentences and eliminate Supreme Court's exclusive and mandatory jurisdiction." 483

2   F.Supp.2d at 928.

3        The erroneous statement of the law included in *dictum* in *Swoopes* was repeated in

4   *dictum* in *Castillo v. McFadden*, 399 F.3d 993 (9th Cir. 1994) and several district cases.

5   *See*, *Crowell,* 483 F.Supp.2d at 930 and n. 4 (compiling cases).  These cases, however,

6   "present a tale of zombie precedent.  A rule definitively extinguished by statutory

7   amendment in 1989 continues to prowl, repeatedly re-animated by mistaken citation and

8   dicta." *Id.* at 931.

9        Accordingly, in *Crowell*, the court found that "[s]ince 1989, the Arizona Supreme

10  Court has not had exclusive appellate jurisdiction over cases carrying life sentences, and

11  petitioners who have received a life sentence have not had a right to State Supreme Court

12  review." *Id.*  The court went on to hold that:

13       In sum, the language of *Swoopes* on life sentences was dictum unnecessary
         for the correct disposition of that case.  The subsequent repetition of that
14       dictum as dictum in other cases does not change its character.  Nor do any of
         the dicta undercut the clarity of the pronouncement by the Arizona Supreme
15       Court, together with the 1989 enactments of the Arizona Legislature, that
         discretionary review in non-capital cases is 'unavailable' for purposes of
16       federal habeas exhaustion.

17  *Id.* at 933.  The *Crowell* court found that petitioner, who had received a life sentence, had

18  exhausted his claims by presenting them to the Arizona Court of Appeals.  *Id.*   The court

19  further noted that support for its conclusion could be found in *Swoopes*.  483 F.Supp.2d at

20  933.  "Applying *O'Sullivan*, *Swoopes* held that 'Arizona has declared that its complete

21  round [of appellate review] does not include discretionary review before the Arizona

22  Supreme Court.'" 483 F.Supp.2d at 933 (quoting *Swoopes*, 940 F.3d 1308).  Significantly,

23  the *Crowell* court concluded that "there is no longer any basis for distinguishing among

24  non-capital sentences under 28 U.S.C. § 2254(c) in light of the 1989 amendments to A.R.S.

25  § 12-120.21(A)(1) and 13-4031."  *Crowell*, 483 F.Supp.2d at 933.

26       In view of Arizona law, A.R.S. § 12-120.21(A)(1) and 13-4031, and the thorough

27  and analytical discussion in *Crowell*, to properly exhaust his federal claims, Petitioner, who

28  received a life sentence in this case, was not required to present his claims to the Arizona

1    Supreme Court.  Rather, the "highest court" requirement is satisfied by fair presentation to

2    the Arizona Court of Appeals.

3         The Supreme Court's decision in *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) does not

4    require a different conclusion. Respondents argue that pursuant to *Baldwin*, non-capital

5    defendants must exhaust their claims in the Arizona Supreme Court.  Respondents'

6    argument hinges on the following language in *Baldwin*, "[t]o provide the State with the

7    necessary 'opportunity,' [to rule on his claims] the prisoner must 'fairly present' his claim

8    in each appropriate state court (*including a state supreme court with powers of*

9    *discretionary review*), thereby alerting that court to the federal nature of the claim. *Duncan*,

10   *supra*, at 365-366, 115 S.Ct. 887; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct.

11   1728, 144 L.Ed.2d 1 (1999)." *Baldwin*, 541 U.S. at 29 (emphasis added).  Respondents

12   latch onto a single phrase, "including a state supreme court with powers of discretionary

13   review," to support their argument and ignore the basis for this statement.  In *O'Sullivan*,

14   the Supreme Court explained that proper exhaustion requires the prisoner to "give the state

15   courts one full opportunity to resolve any constitutional issues by invoking one complete

16   round of the State's established appellate review process." *O'Sullivan*, 526 U.S. 845. "One

17   complete round" includes filing a "petition[] for discretionary review *when that review is*

18   *part of the ordinary appellate review procedure in the State*." *Id.* (emphasis added).

19        As previously stated, "Arizona has declared that its complete round [of appellate

20   review] does not include discretionary review before the Arizona Supreme Court."

21   *Swoopes*, 940 F.3d 1308.[6]  Thus, contrary to Respondents' assertion, *Baldwin* does not

22   require a non-capital prisoner in Arizona, such as Petitioner, to present his claims to the

23   Arizona Supreme Court.

24   _____

25      [6] In support of their assertion that discretionary review by the Arizona Supreme Court is part
     of the appeals process in Arizona, Respondents cite *State v. Ikirt*, 160 Ariz. 113, 117, 770 P.2d
26   1159, 1163 (1989).  (docket # 13 at 18 n. 9) This case was decided before the April 1989
     amendments to A.R.S. § 12-120.21(A)(1) and § 13-4031which omitted the phrase "or life
27   imprisonment" and effectively gave the Arizona Court of Appeals jurisdiction over criminal
     convictions carrying life sentences.
28

1

**B. Fair Presentation**

2        In addition to presenting his claims to the proper court, a state prisoner must fairly

3   present his claims to that court to satisfy the exhaustion requirement.  Fair presentation

4   requires a petitioner to describe both the operative facts and the federal legal theory to the

5   state courts.  *Reese*, 541 U.S. at 28.  It is not enough that all of the facts necessary to

6   support the federal claim were before the state court or that a "somewhat similar" state law

7   claim was raised.  *Reese*, 541 U.S. at 28 (stating that a reference to ineffective assistance of

8   counsel does not alert the court to federal nature of the claim).  Rather, the habeas

9   petitioner must cite in state court to the specific constitutional guarantee upon which he

10  bases his claim in federal court.  *Tamalini v. Stewart*, 249 F.3d 895, 898 (9th Cir. 2001).

11  Similarly, general appeals to broad constitutional principles, such as due process, equal

12  protection, and the right to a fair trial, are insufficient to establish fair presentation of a

13  federal constitutional claim.  *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000),

14  *amended on other grounds*, 247 F.3d 904 (9th Cir. 2001); *Shumway v. Payne*, 223 F.3d

15  982, 987 (9th Cir. 2000) (insufficient for prisoner to have made "a general appeal to a

16  constitutional guarantee," such as a naked reference to "due process," or to a "constitutional

17  error" or a "fair trial").  Likewise, a mere reference to the "Constitution of the United

18  States" does not preserve a federal claim.  *Gray v. Netherland*, 518 U.S. 152, 162-63

19  (1996).  Even if the basis of a federal claim is "self-evident" or if the claim would be

20  decided "on the same considerations" under state or federal law, the petitioner must make

21  the federal nature of the claim "explicit either by citing federal law or the decision of the

22  federal courts . . . ."  *Lyons*, 232 F.3d at 668.  A state prisoner does not fairly present a

23  claim to the state court if the court must read beyond the pleadings filed in that court to

24  discover the federal claim.  *Baldwin*, 541 U.S. at 27.

25        In sum, "a petitioner fairly and fully presents a claim to the state court for purposes

26  of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum,

27  (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for

28  the claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005)(citations omitted).

1

**C.  Exhaustion and Procedural Bar**

2          A habeas petitioner's claims may be precluded from federal review in either of two

3   ways.  First, a claim may be procedurally defaulted in federal court if it was actually raised

4   in state court but found by that court to be defaulted on state procedural grounds such as

5   waiver or preclusion.  *Ylst v. Nunnemaker*, 501 U.S. 797, 802-05 (1991); *Coleman*, 501

6   U.S. at 729-30.  Thus, a state prisoner may be barred from raising federal claims that he did

7   not preserve in state court by making a contemporaneous objection at trial, on direct appeal,

8   or when seeking post-conviction relief.  *Bonin v. Calderon*, 59 F.3d 815, 842 (9th Cir. 1995)

9   (stating that failure to raise contemporaneous objection to alleged violation of federal rights

10  during state trial constitutes a procedural default of that issue); *Thomas v. Lewis*, 945 F.2d

11  1119, 1121 (9th Cir. 1991) (finding claim procedurally defaulted where the Arizona Court

12  of Appeals held that habeas petitioner had waived claims by failing to raise them on direct

13  appeal or in first petition for post-conviction relief.)  If the state court also addressed the

14  merits of the underlying federal claim, the "alternative" ruling does not vitiate the

15  independent state procedural bar.  *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989);

16  *Carringer v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992) (state supreme court found

17  ineffective assistance of counsel claims "barred under state law," but also discussed and

18  rejected the claims on the merits, *en banc* court held that the "on-the-merits" discussion

19  was an "alternative ruling" and the claims were procedurally defaulted and barred from

20  federal review).  A higher court's subsequent summary denial of review affirms the lower

21  court's application of a procedural bar.  *Nunnemaker*, 501 U.S. at 803.

22          The second procedural default scenario arises when a state prisoner failed to present

23  his federal claims to the state court, but returning to state court would be "futile" because

24  the state courts' procedural rules, such as waiver or preclusion, would bar consideration of

25  the previously unraised claims.  *Teague v. Lane*, 489 U.S. 288, 297-99 (1989); *Beaty v.*

26  *Stewart*, 303 F.3d 975, 987 (9th Cir. 2002); *State v. Mata*, 185 Ariz. 319, 322-27, 916 P.2d

27  1035, 1048-53 (1996); Ariz. R. Crim. P. 32.2(a) & (b); Ariz. R. Crim. P. 32.1(a)(3) (post-

28  conviction review is precluded for claims waived at trial, on appeal, or in any previous

1    collateral proceeding); 32.4(a); Ariz. R. Crim. P. 32.9 (stating that petition for review must

2    be filed within thirty days of trial court's decision).  A state post-conviction action is futile

3    where it is time-barred.  *Beaty*, 303 F.3d at 987; *Moreno v. Gonzalez*, 116 F.3d 409, 410

4    (9th Cir. 1997) (recognizing untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for

5    dismissal of an Arizona petition for post-conviction relief, distinct from preclusion under

6    Rule 32.2(a)).  This type of procedural default is known as "technical" exhaustion because

7    although the claim was not actually exhausted in state court, the petitioner no longer has an

8    available state remedy.  *Coleman*, 501 U.S. at 732 ("A habeas petitioner who has defaulted

9    his federal claims in state court meets the technical requirements for exhaustion; there are

10   no remedies any longer 'available' to him.").

11           **D.  Excusing Procedural Bar**

12           In either case of procedural default, federal review of the claim is barred absent a

13   showing of "cause and prejudice" or a "fundamental miscarriage of justice."  *Cook v.

14   Schriro*, 516 F.3d 802, 827-29 (9th Cir. 2008); *Dretke v. Haley*, 541 U.S. 386, 393-94,

15   (2004); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To establish "cause," a petitioner

16   must establish that some objective factor external to the defense impeded his efforts to

17   comply with the state's procedural rules.  *Id.*  The following objective factors may

18   constitute cause: (1) interference by state officials, (2) a showing that the factual or legal

19   basis for a claim was not reasonably available, or (3) constitutionally ineffective assistance

20   of counsel.  *Id.*  Ordinarily, the ineffective assistance of counsel in collateral proceedings

21   does not constitute cause because "the right to counsel does not extend to state collateral

22   proceedings or federal habeas proceedings." *Martinez-Villareal v. Lewis*, 80 F.3d 1301,

23   1306 (9th Cir. 1996).

24           Prejudice is actual harm resulting from the constitutional violation or error.  *Magby

25   v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984).  To establish prejudice, a habeas

26   petitioner bears the burden of demonstrating that the alleged constitutional violation

27   "worked to his actual and substantial disadvantage, infecting his entire trial with error of

28   constitutional dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982); *Thomas v.*

1   *Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1996).  Where petitioner fails to establish cause, the

2   court need not reach the prejudice prong.

3        A federal court may also review the merits of a procedurally defaulted claim if

4   petitioner demonstrates that failure to consider the merits of his claim will result in a

5   "fundamental miscarriage of justice."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  A

6   "fundamental miscarriage of justice" occurs when a constitutional violation has probably

7   resulted in the conviction of one who is actually innocent.  *Id.*  To satisfy the "fundamental

8   miscarriage of justice" standard, petitioner must establish that it is more likely than not that

9   no reasonable juror would have found him guilty beyond a reasonable doubt in light of new

10  evidence.  *Schlup*, 513 U.S. at 327; 28 U.S.C. § 2254(c)(2)(B).  Even if petitioner asserts a

11  claim of actual innocence to excuse his procedural default of a federal claim, federal habeas

12  relief may not be granted absent a finding of an independent constitutional violation

13  occurring in the state criminal proceedings.  *Dretke*, 541 U.S. at 393-94.

14  **III.  Standard of Review**

15       In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

16  ("AEDPA") which "modified a federal habeas court's role in reviewing state prisoner

17  applications in order to prevent federal habeas 'retrials' and to ensure that state-court

18  convictions are given effect to the extent possible under the law." *Bell v. Cone*, 535 U.S.

19  685, 693 (2002).

20       Under the AEDPA, a state prisoner "whose claim was adjudicated on the merits in

21  state court is not entitled to relief in federal court unless he meets the requirements of 28

22  U.S.C. § 2254(d)."  *Price v. Vincent*, 538 U.S. 634, 638 (2003).  Thus, a state prisoner is

23  not entitled to relief unless he demonstrates that the state court's adjudication of his claims

24  "resulted in a decision that was contrary to, or involved an unreasonable application of,

25  clearly established Federal law, as determined by the Supreme Court of the United States"

26  or "resulted in a decision that was based on an unreasonable determination of the facts in

27  light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1),(2);

28  *Carey v. Musladin*, 549 U.S. 70 (2006); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003);

1   *Mancebo v. Adams*, 435 F.3d 977, 978 (9th Cir. 2006).  To determine whether a state court

2   ruling was "contrary to" or involved an "unreasonable application" of federal law, courts

3   must look exclusively to the holdings of the Supreme Court which existed at the time of the

4   state court's decision.  *Mitchell v. Esparza*, 540 U.S. 12, 15-15 (2003); *Yarborough v.*

5   *Gentry*, 540 U.S. 1, 5 (2003).  Accordingly, the Ninth Circuit has acknowledged that it

6   cannot reverse a state court decision merely because that decision conflicts with Ninth

7   Circuit precedent on a federal constitutional issue.  *Brewer v. Hall*, 378 F.3d 952, 957 (9th

8   Cir. 2004); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

9        Even if the state court neither explained its ruling nor cites United States Supreme

10   Court authority, the reviewing federal court must nevertheless examine Supreme Court

11   precedent to determine whether the state court reasonably applied federal law.  *Early v.*

12   *Packer*, 537 U.S. 3, 8 (2003).  The United States Supreme Court has expressly held that

13   citation to federal law is not required and that compliance with the habeas statute "does not

14   even require awareness of our cases, so long as neither the reasoning nor the result of the

15   state-court decision contradicts them." *Id.*

16        A state court's decision is "contrary to" federal law if it applies a rule of law "that

17   contradicts the governing law set forth in [Supreme Court] cases or if it confronts a set of

18   facts that are materially indistinguishable from a decision of [the Supreme Court] and

19   nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v.*

20   *Esparza*, 540 U.S 12, 14 (2003)(citations omitted); *Williams v. Taylor*, 529 U.S. 362, 411

21   (2000).

22        A state court decision involves an "unreasonable application of" federal law if the

23   court identifies the correct legal rule, but unreasonably applies the rule to the facts of a

24   particular case.  *Williams*, 529 U.S. at 405; *Brown v. Payton*, 544 U.S. 133, 141 (2005).

25   An incorrect application of federal law does not satisfy this standard.  *Yarborough v.*

26   *Alvarado*, 541 U.S. 652, 665-66 (2004) (stating that "[r]elief is available under §

27   2254(d)(1) only if the state court's decision is objectively unreasonable.") "It is not enough

28   that a federal habeas court, in its independent review of the legal question," is left with the

1    "firm conviction" that the state court ruling was "erroneous." *Id.*; *Andrade*, 538 U.S. at 75.

2    Rather, the petitioner must establish that the state court decision is "objectively

3    unreasonable." *Middleton v. McNeil*, 541 U.S. 433 (2004); *Andrade*, 538 U.S. at 76.

4            Where a state court decision is deemed to be "contrary to" or an "unreasonable

5    application of" clearly established federal law, the reviewing court must next determine

6    whether it resulted in constitutional error. *Benn v. Lambert*, 283 F.3d 1040, 1052 n. 6 (9th

7    Cir. 2002).  Habeas relief is warranted only if the constitutional error at issue had a

8    "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.

9    Abrahamson*, 507 U.S. 619, 631 (1993).  In § 2254 proceedings, the federal court must

10   assess the prejudicial impact of a constitutional error in a state-court criminal proceeding

11   under *Brecht's* more forgiving "substantial and injurious effect" standard, whether or not

12   the state appellate court recognized the error and reviewed it for harmlessness under the

13   "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386

14   U.S. 18, 24 (1967); *Fry v. Pliler*, ___ U.S.___, 127 S.Ct. 2321, 2328 (2007).  The *Brecht*

15   harmless error analysis also applies to habeas review of a sentencing error.  The test is

16   whether such error had a "substantial and injurious effect" on the sentence. *Calderon v.

17   Coleman*, 525 U.S. 141, 145-57 (1998) (holding that for habeas relief to be granted based

18   on constitutional error in capital penalty phase, error must have had substantial and

19   injurious effect on the jury's verdict in the penalty phase.); *Hernandez v. LaMarque*, 2006

20   WL 2411441 (N.D.Cal., Aug. 18, 2006) (finding that even if the evidence of three of

21   petitioner's prior convictions was insufficient, petitioner was not prejudiced by the court's

22   consideration of those convictions because the trial court found four other prior convictions

23   which would have supported petitioner's sentence.)  The Court will review Petitioner's

24   claims that are properly before it under the applicable standard of review.

25

26

27

28   **IV. Analysis of Petitioner's Claims**

1    Petitioner presents 24 grounds for relief in his Petition for Writ of Habeas Corpus.

2    (docket # 1)  Below, the Court will determine whether Petitioner has satisfied the

3    exhaustion requirement and, where appropriate, consider the merits of Petitioner's claims

4    that are properly before the Court.

5    **A.  Ground One - Sufficiency of the Evidence**

6    In Ground I, Petitioner alleges that his conviction violates the Fourteenth

7    Amendment because there was insufficient evidence to prove that he and his

8    co-conspirators intended to cause the death of another person.  (docket # 1 at 15)

9    **1.  Exhaustion and Procedural Bar**

10   Respondents assert that Petitioner's Fourteenth Amendment claim raised in Ground

11   One is unexhausted and procedurally barred because Petitioner did not raise that claim in

12   "each appropriate state court," including the state trial court.  (docket #  13)  Petitioner

13   disputes this assertion.  Respondents correctly assert that although Petitioner challenged the

14   sufficiency of the evidence in his motions pursuant to Rules 20 and 24 of the Arizona Rules

15   of Criminal Procedure for judgment of acquittal and for a new trial, he did not raise a

16   federal claim in either motion. (Respondents' Exh. W, Rule 20 Motion for Judgment of

17   Acquittal; Exh. X, Rule 24 Motion for New Trial; Petitioner's Exhs. X, Y) Although

18   Petitioner's mere failure to raise his federal claim to the trial court did not result in a

19   procedural default of that claim, he also failed to raise a federal claim to the Arizona Court

20   of Appeals.

21   On direct appeal, Petitioner argued that his conviction of conspiracy to commit first-

22   degree murder violated the Fourteenth Amendment because neither he nor any of his co-

23   conspirators expressed an intent to kill.  Rather, at most, co-conspirator Schilinski had

24   conditional intent to kill if necessary.  (Respondents' Exh. E at 32-34) Although Petitioner

25   referred to the Fourteenth Amendment, his argument relied almost exclusively on state law

26   cases from courts in North Carolina and Ohio. (Respondents' Exh. E at 32-34)(citing *State*

27   *v. Irwin*, 285 S.E.2d 345 (N.C. 1982) and *State v. Kinnemore*, 295 N.E.2d 680 (Ohio App.

28   1972)).  Petitioner cited a single federal case, *Payne v. Janasz*, 711 F.2d 1305 (6th Cir.

1   1983), for the proposition that, under the Fourteenth Amendment, a criminal defendant

2   cannot be convicted except upon proof beyond a reasonable doubt. (Respondents' Exh. E at

3   34)

4          Petitioner's mere citations to the Fourteenth Amendment is not sufficient to exhaust

5   a federal claim, *Reese*, 541 U.S. at 28.  General appeals to broad constitutional principles,

6   such as due process, equal protection, and the right to a fair trial, are insufficient to

7   establish fair presentation of a federal constitutional claim.  *Lyons v. Crawford*, 232 F.3d

8   666, 669 (9th Cir. 2000).  Petitioner's mere citation to the Fourteenth Amendment on direct

9   appeal was not sufficient to exhaust a federal claim.  The body of Petitioner's argument

10  plainly asserted a state-law challenge to the elements necessary to prove conspiracy to

11  commit first-degree murder under Arizona law.  (Respondents' Exh. E at 32-34) Moreover,

12  the Arizona Court of Appeals found that Petitioner's claim failed because the state cases

13  upon which he relied expressed a minority view that conditional intent is insufficient to

14  support a *mens rea* for conspiracy to commit first-degree murder.  (Petitioner's Exh. C at

15  14-15; Respondents' Exh. L at 14-15)  The appellate court concluded that "the better view"

16  was expressed in *United States v. Holloway*, 526 U.S. 1 (1999), where the Supreme Court

17  found that conditional intent satisfied the intent requirement in the federal car jacking

18  statute.  In so holding, the Court of Appeals relied on the Supreme Court's statement in

19  *Holloway* that "a defendant may not negate a proscribed intent by requiring a victim to

20  comply with a condition he has no right to impose; an intent to kill, in the alternative, is

21  nevertheless, an intent to kill."  (Petitioner's Exh. C at 16; Respondents' Exh. L at

22  16)(quoting *Holloway*, 526 U.S. at 9).  Although the Court of Appeals considered a United

23  States Supreme Court case in resolving Petitioner's claim, it relied on *Holloway* only to

24  analogize Arizona's statutes governing conspiracy to commit first-degree murder to the

25  federal car jacking statute.  (*Id.*)  *Holloway* did not involve a Fourteenth Amendment

26  challenge and the citation to that case did not convert Petitioner's state law claim into a

27  federal claim.  Accordingly, Petitioner's Fourteenth Amendment claim asserted in Ground I

28  is unexhausted and, as discussed in Section V, *infra*, procedurally barred.

**2.  Merits Analysis - Ground One**

Alternatively, even if Petitioner's Fourteenth Amendment claim raised in Ground I were properly before this Court, it fails on the merits.  Petitioner argues that the evidence presented at trial "demonstrated there was never an agreement between any conspirator to commit the offense of murder" and, therefore, the State failed to prove the "statutory requirements" beyond a reasonable doubt and his conviction for conspiracy to commit first degree murder violates the Fourteenth Amendment.  (docket # 1 at 5) The elements necessary to prove conspiracy to commit first-degree murder under Arizona law are central to the resolution of Ground One.[7]

In June 2000, Petitioner was charged with conspiracy to commit first degree murder, pursuant to A.R.S. §§ 13–1003 and 13–1105.  (Respondents' Exh. A)  Under A.R.S. § 13–1105 (2000), a person commits first degree murder if "[i]ntending or knowing that the person's conduct will cause death, the person causes the death of another with premeditation." A person commits conspiracy if, "with the intent to promote or aid the commission of an offense, such person agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense and one of the parties commits an overt act in furtherance of the offense, except that an overt act shall not be required if the object of the conspiracy was to commit any felony upon the person of another." A.R.S. § 13–1003.

At the time of Petitioner's trial (December 2000 - January 2001), first degree murder under A.R.S. § 13–1105 was considered a "specific intent" crime, requiring the specific intent to kill another person. *See State v. Murray*, 184 Ariz. 9, 32, 906 P.2d 542, 565 (1995); *State v. Fisher*, 176 Ariz. 69, 79, 859 P.2d 179, 189 (1993); *see generally* A.R.S. §

---

[7] In his reply, Petitioner attempts to re-cast his first ground for relief as a challenge to the jury instructions.  He claims that the Arizona Court of Appeals' decision "added a new element" to the crime and that the jury, rather than an appellate judge, was required to find the "existence of each element of the charged offense beyond a reasonable doubt."  (docket # 18 at 21)  This claim was never presented to the state courts on post-conviction review and, therefore, is unexhausted and not properly before this Court.

1   13-1105. At that time, Arizona courts had not addressed whether "conditional" intent was

2   sufficient to satisfy the *mens rea* of a "specific" intent crime. Other states that had

3   addressed the issue were split. *Compare, e.g., State v. Irwin*, 285 S.E.2d 345, 349 (N.C.

4   1982) and *State v. Kinnemore*, 295 N.E.2d 680, 681–83 (Ohio App. 1972) (both holding

5   that conditional intent not sufficient to satisfy *mens rea* for specific intent crime assault

6   with the intent to kill); with *Holloway v. United States*, 526 U.S. 1, 9–11 (1999) (holding

7   that conditional intent sufficient to satisfy specific intent *mens rea* in federal car jacking

8   statute); *People v. Vandeliner*, 481 N.W.2d 787, 788–89 (Mich. 1992) (holding that

9   conditional intent sufficient to satisfy specific intent *mens rea* for solicitation to commit

10  murder offense).

11          The Arizona Court of Appeals relied on *Holloway* and *Vandeliner* to hold that

12  Petitioner's claim failed because conditional intent was sufficient to establish the *mens rea*

13  for conspiracy to commit first degree murder.  (Petitioner's Exh. C) Petitioner argues that

14  the Arizona Court of Appeals's decision "involved an unreasonable application of federal

15  law by extending the principle in *Holloway v. United States* to a new context in a way that

16  was objectively unreasonable to the facts and evidence of the instant case.  (docket # 18 at

17  19)  Petitioner also argues that he is entitled to habeas corpus relief, because the Arizona

18  Court of Appeals' decision was "contrary to the Arizona Supreme Court's ruling in

19  *Evanchyk*."  (docket # 18 at 16)

20          As an initial matter, with respect to his claim based *Evanchyk v. Stewart*, 202 Ariz.

21  476, 47 P.3d 1114 (Ariz. 2002), Petitioner incorrectly states that the standard of review

22  applicable to §2254 petitions involves whether the State court correctly applied State law.

23  The correct standard is whether the state court's adjudication of the federal claim "resulted

24  in a decision that was contrary to, or involved an unreasonable application of, clearly

25  established *Federal law*, as determined by the Supreme Court of the United States," not

26  state law.  *See* 28 U.S.C. § 2254(d)(1),(2).  To the extent that Petitioner challenges the

27  application of state law, his claim is not cognizable on federal habeas review.  *Estelle v.*

28

1    *McGuire*, 502 U.S. 62, 67-68 (1991)(explaining that "it is not the province of a federal

2    habeas court to reexamine state-court determinations on state-law questions.").

3          Moreover, Petitioner's claim fails.  Petitioner asserts that the Arizona Supreme

4    Court's decision in *Evanchyk*, 202 Ariz. 476, 47 P.3d 1114 (2002), which was decided

5    while Petitioner's direct appeal was pending, constitutes a significant change in the law

6    which would probably have changed the outcome of his case.  In *Evanchyk*, the Arizona

7    Supreme Court considered whether a defendant could be convicted of conspiracy to commit

8    first-degree murder based on an allegation that he conspired to commit the crime under a

9    felony-murder theory, as opposed to a theory of premeditation.  *Id.*  The Arizona Supreme

10   Court held that defendant could not be convicted of first-degree murder under such a

11   theory.  The Arizona Supreme Court affirmed that a defendant can be guilty of conspiracy

12   to commit first-degree murder if he intended to kill or promote or aid in the killing and

13   made an agreement to kill.  *Id.*  In reaching this conclusion, the Arizona Supreme Court

14   relied on Arizona Court of Appeals' decisions as old as 1981.

15         Petitioner is correct that *Evanchyk* announced a new rule of law to the extent that it

16   held that a conviction to commit first degree murder based solely on a felony-murder theory

17   was invalid.  However, *Evanchyk* does not apply to Petitioner's case because he was not

18   convicted under a theory of felony-murder.  Rather, the jury was only instructed on a theory

19   of premeditation.  (Respondents' Exh. MM at 8-10)

20         Moreover, the statement in *Evanchyk* that conspiring to commit first degree murder

21   is a specific intent crime in Arizona was not new law.  Rather, at the time of Petitioner's

22   trial (December 2000 - January 2001), first degree murder under § 13–1105 was considered

23   a "specific intent" crime, requiring the specific intent to kill another person. *See State v.*

24   *Murray*, 184 Ariz. 9, 32, 906 P.2d 542, 565 (1995); *State v. Fisher*, 176 Ariz. 69, 79, 859

25   P.2d 179, 189 (1993); *see generally* A.R.S. § 13-1105.  The trial court instructed the jury

26   that first-degree murder required that one act intentionally or knowingly and with

27   premeditation.  (Respondents' Exh. MM at 8-10)  *Evanchyk* did not require a different jury

28   instruction.

1   Petitioner's claim that the appellate court unreasonably applied *Holloway* also fails.

2   In rejecting Petitioner's Fourteenth Amendment challenge, the appellate court cited *United*

3   *States v. Holloway*, 526 U.S. 1 (1999), where the Supreme Court found that conditional

4   intent satisfied the intent requirement in the federal car-jacking statute.  The Court of

5   Appeals specifically relied on the Supreme Court's statement in *Holloway* that "a defendant

6   may not negate a proscribed intent by requiring a victim to comply with a condition he has

7   no right to impose; an intent to kill, in the alternative, is nevertheless, an intent to kill."

8   (Petitioner's Exh. C at 16)(quoting *Holloway*, 526 U.S. at 9).  The Court of Appeals did not

9   unreasonably draw an analogy between Arizona's statutes governing conspiracy to commit

10  first-degree murder and the federal car-jacking statute.  Both statutes required the defendant

11  to have the requisite intent to commit the crime.  The *Holloway* Court's statement that "a

12  defendant may not negate a proscribed intent by requiring a victim to comply with a

13  condition he has no right to impose; an intent to kill, in the alternative, is nevertheless, an

14  intent to kill," *Holloway*, 526 U.S. at 9, was reasonably applied to Petitioner's case.

15      Petitioner's first ground for relief fails because Petitioner has not established that the

16  state court's resolution of that claim was contrary to or resulted in an unreasonable

17  application of federal law. 28 U.S.C. § 2254(d)(1),(2).

18      **B. Ground II - Fourth Amendment Violation**

19      In Ground II, Petitioner argues that his conviction violates the Fourth Amendment

20  because police lacked "probable cause to arrest and subsequently search[8] the vehicle" in

21  which Petitioner was a passenger. (docket # 1 at 6, docket # 18 at 24-42)  Therefore, he

22  argues, the trial court erred in failing to suppress physical evidence seized from the minivan

23  – handguns, ammunition, rubber gloves.  (*Id.*)  As discussed below, Petitioner's Fourth

24  Amendment claims is not cognizable on § 2254 review.

25  _____

26      [8] To the extent that Petitioner asserts a separate Fourth Amendment violation based on the
    search of the vehicle, such a claim is procedurally barred from habeas review because Petitioner

27  never presented this claim to the State courts.  (*see* Respondents' Exhs. K, M, Y); *Noltie v.*

28  *Peterson*, 9 F.3d 802, 804 (9th Cir. 1993).

- 31 -

1          When the State provides an opportunity for full and fair litigation of a fourth

2   amendment claim, such a claim is not cognizable in federal habeas proceedings. *Stone v.*

3   *Powell*, 428 U.S. 465, 481–82 (1976); *Villafuerte v. Stewart*, 111 F.3d 616, 627 (9th Cir.

4   1997); *Siripongs v. Calderon*, 35 F.3d 1308, 1321 (9th Cir. 1994); *Mitchell v. Goldsmith*,

5   878 F.2d 319, 323 (9th Cir. 1989); *Caldwell v. Cupp*, 781 F.2d 714, 715 (9th Cir. 1986).

6   *Stone* only requires the initial opportunity for a full and fair hearing.  *Caldwell*, 781 F.2d at

7   715. "Such an opportunity for a fair hearing forecloses this court's inquiry, upon habeas

8   corpus petition, into the trial court's subsequent course of action."  *Caldwell*, 781 F.2d at

9   715.

10          The record reflects that the State provided an opportunity for full and fair litigation

11   of Petitioner's claim that police lacked probable cause to arrest him and, therefore,

12   evidence seized from the van should have been suppressed.  On July 31, 2000, Petitioner

13   moved to suppress the evidence found in the van alleging that his arrest was "unsupported

14   by probable cause."  (Petitioner's Exh. 11; Respondents' Exh. Y)  On September 14, 2000,

15   the trial court conducted a suppression hearing.  (Petitioner's Exh. 11; Respondents' Exh.

16   OO)  After the suppression hearing, the trial court denied the motion to suppress,

17   concluding that sufficient probable cause existed to arrest Petitioner.  (*Id.* at 65-70)

18   Because the State provided a full, fair hearing on the issue of probable cause and the

19   admissibility of the evidence seized in the search on the van, habeas corpus relief is not

20   available on Fourth Amendment grounds. *Stone*, 428 U.S. at 481–82; *Siripongs,* 35 F.3d at

21   1321.

22          Moreover, even if Petitioner's Fourth Amendment claim were cognizable on federal

23   habeas review, it is procedurally defaulted.  Although Petitioner fairly presented a Fourth

24   Amendment claim based on lack of probable cause to arrest to the trial court in his motion

25   to suppress (Respondents' Exh. Y), Petitioner failed to properly present this claim to the

26   Arizona Court of Appeals.  Petitioner did not raise a Fourth Amendment claim in his

27   opening brief on direct appeal.  (Respondents' Exh. E)  Rather, Petitioner raised a Fourth

28   Amendment claim in his second supplemental appellate brief.  (Respondents' Exh. K;

1    Petitioner's Exhs. A, 11) The Arizona Court of Appeals, however, declined to address the

2    issue on procedural grounds, holding that the second supplemental brief was not authorized

3    by Arizona Rule of Civil Appellate Procedure 13. (Respondents' Exh. L at 6; Petitioner's

4    Exh. C at 6) The State court's assertion of a procedural bar precludes federal review of

5    Petitioner's Fourth Amendment claim.  *See Nunnemaker*, 501 U.S. at 802–05;

6    *Insyxiengmay*, 403 F.3d at 665.

7         **C.  Ground III - Recusal**

8         In Ground III, Petitioner argues the refusal of the Honorable Steven F. Conn to

9    recuse himself from Petitioner's trial violated his Fourteenth Amendment rights to a fair

10   trial and due process.  (docket # 1 at 7)  Specifically, Petitioner contends that Judge Conn

11   should have recused himself because: (1) he received "extra-judicial disputed evidentiary

12   facts" before Petitioner's trial which suggested that he and his court staff "could have been

13   harmed," which resulted in prejudicial rulings against Petitioner;[9] (2) he was a "material

14   witness to critical facts of [Petitioner's] case;" and (3) he ordered the "sudden presence of

15   heightened law enforcement that put fear in the defense counsel and the jury."  (docket # 1

16   at 7)

17        Respondents argue that Petitioner's factual allegations regarding the heightened

18   presence of law enforcement, were never presented to the State courts, and therefore, such

19   allegations are procedurally defaulted.  The Court agrees.  Petitioner never presented his

20   claim based on the increased presence of law enforcement to the state courts either on

21   direct appeal or collateral proceedings.  Accordingly, federal habeas review of those

22   assertions is procedurally barred.  *See Gauf v. Ontiveres*, No. CV-06-804-PHX-DGC

23   (JCG), 2007 WL 1713287, * 5 (D.Ariz. June 12, 2007)(noting that presentation of one set

24   of operative facts in support of a federal claim does not properly exhaust the same federal

25   claim based on a different set of facts).

26   ────────────────

27        [9]   Judge Conn was assigned to preside over Goldberg's change of plea hearing on June 12,
     2000, and received advance notice of the the planned jailbreak. (Respondents' Exh. KK,
28   Tr.1/19/0101, at 186.)

1      Respondents further argue that Petitioner failed to exhaust his other two factual

2  theories underlying his Fourteenth Amendment challenge to Judge Conn's failure to recuse

3  himself because he failed to present those claims to the Arizona Supreme Court on direct

4  review.  (docket # 13)  As discussed above, Petitioner was not required to present his

5  federal claims to the Arizona Supreme Court, *see* Section II. A., *supra*.  The Court finds

6  that Petitioner properly exhausted his claims that the Judge Conn should have recused

7  himself because (1) he received "extra-judicial" information before Petitioner's trial

8  indicating that he and his court staff "could have been harmed," which resulted in

9  prejudicial rulings against Petitioner; and (2) he was a "material witness to critical facts of

10  [Petitioner's] case by presenting those claims to the Arizona Court of Appeals.[10]

11  (Respondents' Exh. E)

12      On the first day of trial, Petitioner moved for a change of judge for cause, alleging

13  that "DEFENDANT above [sic] has recieved [sic] State's disclosure, after many, many

14  attempts, from his former counsel, in which Judge Steven Conn has been mentioned by

15  name alleging some unwilling participation." (Respondents' Exh. Z; Petitioner's Exh. P)

16  Petitioner did not cite any legal authority in support of his motion.  (*Id.*)  The trial judge,

17  the Honorable Steven F. Conn, analyzed the motion pursuant to Ariz.R.Crim.P. 10.1 which

18  governed motions for change of judge for cause.  (Respondents' Exh. B, Petitioner's Exh.

19  Q)  Judge Conn denied the motion as "untimely" under Ariz.R.Crim.P. 10.1 and further

20  noted that the basis for the motion was "so vague as to defy being able to be addressed in

21  any way."  (Respondents' Exh. B; Petitioner's Exh. Q)

22      On direct appeal, Petitioner asserted that Judge Conn should have recused himself

23  because it is "logical to infer" that he would not have been impartial based on his

24  knowledge that the conspirators had attempted to help Goldberg escape from his

25  _____

26      [10]  In his Reply, Petitioner greatly expands his recusal claim.  (docket # 18 at 42-53) The
   Court will only address those claims previously described which Petitioner properly presented

27  to the State courts.  Petitioner's attempt to expand his claim in his Reply is insufficient to

28  exhaust a claim.

1    courtroom, and because Judge Conn was a potential witness based on his observation of the

2    Cofskys entering his courtroom on the morning of the planned escape.  (Respondents' Exh.

3    E at 41–42; Exh. L at 7)  The Arizona Court of Appeals rejected these claims noting that

4    "[n]o specific facts were alleged in" Petitioner's motion for change of judge, and that the

5    motion was "properly denied [] on that basis." (Respondents' Exh. L at 7)  Because

6    Petitioner had not raised the specific claims he asserted on appeal to the trial court, the

7    Arizona Court of Appeals reviewed those new claims for fundamental error, and concluded

8    they were "not supported [] with citations to any evidence in the record," and were "clearly

9    unreasonable." (*Id.* at ¶ 15) The appellate court found "no merit" to Petitioner's contention

10   that Judge Conn should have recused himself. (*Id.*)

11        The Court of Appeals' fundamental error review is sufficient to exhaust Petitioner's

12   challenge to Judge Conn's failure to recuse himself because the court specifically identified

13   which claims it was reviewing.  *Poland v. Stewart*, 117 F.3d 1094, 1105-06 (9th Cir. 1997);

14   *Moorman v. Schriro*, 426 F.3d 1044, 1057 (9th Cir. 2005)(holding that a claim is considered

15   exhausted by Arizona's fundamental error review if it was explicitly noted in the briefs

16   presented to the state appellate court, or the state court mentions it is considering the claim

17   *sua sponte*.)

18        Regardless, Petitioner's recusal claim fails on the merits.  "Opinions formed by the

19   judge on the basis of facts introduced or events occurring in the course of current

20   proceedings, or of prior proceedings, do no constitute a basis for a bias or partiality motion

21   unless they display a deep-seated favoritism or antagonism that would make fair judgment

22   impossible." *Havey v. Hubbard*, 2001 WL 7933281, * 5 (N.D.Cal. 2001).  The

23   determination of judicial bias is a factual question to which the federal courts defer on

24   habeas review.  *See* 28 U.S.C. § 2254(d); *Villafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir.

25   1997)(stating that state court's finding of lack of judicial bias was entitled to a presumption

26   of correctness.)

27        Petitioner argues that Judge Conn's refusal to recuse himself violated his right to a

28   fair trial because Judge Conn was a material witness to the events. (docket # 18 at 42)   In

1   support of this claim, Petitioner states that co-conspirators Eugene and Sheri Cofsky were

2   present in Judge Conn's courtroom on June 12, 2000 and that they were acting

3   suspiciously.  (docket # 18 at 42) Petitioner further states that in a subsequent evidentiary

4   hearing, Judge Conn testified that he had not noticed whether the Cofskys were acting

5   suspiciously while in his courtroom on June 12, 2000.  (docket # 18 at 42)(Tr. 8/22/03 at

6   31)  Petitioner further argues that law enforcement officials had informed Judge Conn that

7   they were not bringing Goldberg to his courtroom on June 12, 2000 because of the planned

8   escape attempt.  Thus, Judge Conn was aware of the conspirators plan to help Goldberg

9   escape and that he and his staff were at risk of harm because "gun play" could be involved.

10  (docket # 18 at 43-44)

11      Petitioner contends that Judge Conn's prior knowledge of the planned escape

12  attempt resulted in biased rulings and impartiality towards the State's witness, Sandra

13  Brice, his court reporter.  (docket # 18 at 44-45) Petitioner explains that during this trial

14  Brice testified that Goldberg and the Cofskys were scheduled to appear on June 12, 2000

15  before Judge Conn.  (docket # 18 at 45)  Petitioner claims that after Brice testified, Judge

16  Conn addressed Brice regarding her independent duties as a court reporter, corroborated her

17  testimony, and vouched for her.  (docket # 18 at 45)  Petitioner further claims that Judge

18  Conn made biased rulings against him.  (docket # 18 at 48)  Specifically, Petitioner

19  contends that Judge Conn "coached the State on how to get around the objections by the

20  defense."  (*Id.*)  He further argues that Judge Conn refused to instruct the jury accurately.

21  (*Id.*)

22      Even if Judge Conn made rulings during trial which were unfavorable to Petitioner,

23  bias can "almost never" be demonstrated solely on the basis of a judicial ruling. *Liteky v.*

24  *United States*, 510 U.S. 540, 555 (1994).  Rather, a judge's remarks or opinions will not

25  demonstrate bias unless they "reveal such a high degree of favoritism or antagonism as to

26  make fair judgment impossible." *Id.*

27      Petitioner claims that the Arizona Court of Appeals incorrectly applied the standard

28  set forth in Arizona Rule of Supreme Court, 81, Arizona Code of Judicial Conduct, Canon

1    3(E)(1)(a), and (d)(iv).  (docket # 18 at 51)  He further argues that the Arizona Court of

2    Appeals unreasonably applied Arizona Code of Professional Conduct in determining that

3    Judge Conn was not biased.  To the extent that Petitioner challenges that Court of Appeals'

4    application of state law, his claim is not cognizable on federal habeas corpus review.

5    *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)(explaining that "it is not the province of a

6    federal habeas court to reexamine state-court determinations on state-law questions.")

7           Petitioner further argues that he was denied a fair trial because Judge Conn was

8    impartial based on his knowledge of events giving rise to Petitioner's case.  Most questions

9    concerning a judge's qualifications to hear a case are not constitutional ones, because the

10   Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a

11   uniform standard. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986).  "Rather, these

12   questions are, in most cases, answered by common law, statute, or the professional

13   standards of the bench and bar." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997)(citing *Aetna*,

14   475 U.S. at 820-821, *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); 28 U.S.C. §§ 144, 455;

15   ABA Code of Judicial Conduct, Canon 3C(1)(a) (1980)).  However, "the floor established

16   by the Due Process Clause requires a 'fair trial in a fair tribunal' . . . before a judge with no

17   actual bias against the defendant or interest in the outcome of his particular case." *Bracy*,

18   520 U.S at 904-05 (citations omitted).  *See also*, *In re Murchison*, 349 U.S. 133, 136

19   (1955). To succeed on a judicial bias claim, however, a petitioner must "overcome a

20   presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*,

21   421 U.S. 35, 47 (1975). Of course, "most matters relating to judicial disqualification [do]

22   not rise to a constitutional level." *FTC v. Cement Inst*., 333 U.S. 683, 702 (1948) (citation

23   omitted).  The Supreme Court has stated that "opinions formed by the judge on the basis of

24   facts introduced or events occurring in the course of the current proceedings, or of prior

25   proceedings, do not constitute a basis for a bias or partiality motion unless they display a

26   deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v.*

27   *United States*, 510 U.S. 540, 555 (1994).  Petitioner has offered no evidence to overcome

28   the "presumption of honesty and integrity" that is accorded the determinations of a judge.

1    *Withrow*, 421 U.S. at 47.  Although Judge Conn had knowledge of the planned escape

2    attempt, there is no evidence that this knowledge resulted in "deep-seated favoritism or

3    antagonism that would make fair judgment impossible."  *Liteky*, 510 U.S. at 555.

4         Petitioner has not established that the Arizona Court of Appeals' conclusion that

5    Judge Conn did not err in declining to recuse himself, was contrary to, or an unreasonable

6    application of, "clearly established Federal law, as determined by the Supreme Court of the

7    United States." 28 U.S.C. § 2254 (d)(1).

8         **D.  Ground IV - Confrontation Clause**

9         In Ground IV, Petitioner alleges a violation of his Sixth Amendment right to

10   confrontation based on the trial court's denial of Petitioner's motion to sever his trial from

11   that of co-defendant Manning and then by admitting into evidence a letter that Manning

12   had written to co-defendant Eugene Cofsky which detailed a story they could use to explain

13   their actions.[11] (Respondents' Exh. CC: Trial Exhibit 2) Petitioner claims that the letter

14   "linked [him] to the conspiracy," and, therefore, should not have been admitted at his trial

15   because Manning did not testify. (docket # 1 at 8)  Petitioner presented this claim to the

16   Arizona Court of Appeals on direct review.  (Respondents' Exh. H)  The appellate court

17   denied relief and the Arizona Supreme Court affirmed that decision.  (Respondents' Exh L)

18   Respondents concede that this claim is properly before this court.  (docket # 13 at 38, 41)

19        As discussed below, Petitioner has not shown that the state court's determination

20   was contrary to, or an unreasonable application of clearly established federal law, as

21   determined by the Supreme Court, or that it was based on an unreasonable determination of

22   the facts in light of the evidence presented at trial.  *See* 28 U.S.C. § 2254(d).  Therefore,

23   Petitioner is not entitled to federal habeas relief on this claim.

24        Petitioner's claim is based on the admission into evidence of the following letter

25   written by co-defendant Manning which read:

26   _____

27   [11]  Correction officers discovered the letter hidden in the cuff of Cofsky's pants
     after transporting him back to jail following a court appearance on July 31, 2000.

28   (Respondents' Exh. FF, Tr. 1/10/01, at 205–08)

1      E.C. This is how its gonna go, and I don't give a fuck if you like it or not.

2      David [Goldberg] called you, told you a buddy of his Dennis [Schilinski] was
       getting out and to use the van, he goes to Vegas to get it and gets busted, gets
3      out comes by bus back to Kingman "if under servalance (sic) is seen picked up
       by me & Sheri [Cofsky]" comes out helps Rich & I witch ditches "Feds got
4      pictures."

5      Dennis takes van to wherever he lives, brings van back on 10th your (sic) in
       Vegas, ask me to bring van to town on 12th around 9:30. I say sure. While
6      Im (sic) washing van I find pistols, put in house *7 & 7* show up on 11th.  He
       has bags full of stuff ready at Walmart and wants to steal bi[ke]s also. I tell
7      him he can shoot 38 but have to replace ammo since [] there (sic) not ours, *7*
       puts guns back in car. We come to town to get bikes, bags and go to court.
8      We were gonna leave van around 12:30 or whenever we were done with van.
       We were going by school w/side of jail for bike check and to buy heroin when
9      pulled over, look E.C. we were under servalance (sic) from at least the 8th think
       about it Bro this story may need work but its (sic) the right one. Your (sic) the
10     one who needs to slow down, and get your lawyer to get your dates back with
       ours E.C. you had a reason to be here you may have a good case but until you
11     show me a better defense this is the one Im (sic) going with. So either show me
       or get with it.
12     RLM

13   (Respondents' Exhs. BB; Exh. CC, Exhibit A)

14         Before trial, Petitioner moved to sever his trial from that of co-defendant Manning.

15   (Respondents' Exh. CC) Petitioner anticipated that the State would introduce Manning's

16   letter at trial to show collusion between Manning and Cofsky.  (Respondents' Exh. CC)

17   Petitioner was concerned that the State would "endeavor to demonstrate . . . that the '7 & 7'

18   or '7' referred to therein is, in fact, Defendant Tracy Date."  (Respondents' Exh. CC at 2)

19   Petitioner argued that the letter was inadmissible against him under *Bruton v. United States*,

20   391 U.S. 123 (1986) where the United States Supreme Court held that a confession of a

21   non-testifying co-defendant which inculpates another defendant is inadmissible at their

22   joint trial. 391 U.S. at 135–37.  (Respondents' Exh. CC at 3) Following a hearing, the trial

23   court denied Petitioner's motion to sever.  Petitioner and Manning were tried together.

24   (Respondents' Exh. DD, 10/11/00 minute entry)

25         As Petitioner had anticipated, Manning's letter was admitted in evidence at

26   Petitioner's trial.  (Respondents' Exh. FF at 207–08) The State called Detective Randy

27   McNally of the Mohave County Sheriff's Office to testify regarding the letter.  The

28   prosecutor asked Officer McNally whether the letter "T" in the word "This" at the

1    beginning of the letter and the number "7" in the phrase "7 and 7" "look the same."

2    (Respondents' Exh. JJ at 77-79)  Detective McNally testified that they did, and that the

3    phrase "7 and 7" "[c]ould be" "'T' and 'T'." (*Id.*) The trial court also admitted in evidence

4    a second letter authored by Manning containing the letter "T" as an exemplar.

5    (Respondents' Exh. JJ at 81–83; Exh. KK at 2–6; Exh. LL at 67–68) Manning did not

6    testify at Petitioner's trial.

7           On direct appeal, Petitioner argued that the trial court's admission of the Manning

8    letter violated *Bruton* and its progeny.  (Respondents' Exh. H at 4-15)  As previously

9    stated, in *Bruton*, the Supreme Court held that a confession of a non-testifying co-defendant

10   which inculpates another defendant is inadmissible at their joint trial. 391 U.S. at 135–37.

11   In *Marsh*, the United States Supreme Court created an exception to the *Bruton* rule.  *Marsh*,

12   483 U.S. at 208-11.  The *Marsh* Court held that admission of a non-testifying

13   co-defendant's confession does not violate the Confrontation Clause when the confession is

14   redacted to eliminate the defendant's name and any reference to his existence, and the trial

15   court instructs the jury not to use the confession against the defendant. *Marsh*, 481 U.S. at

16   208–11.  Petitioner argued on appeal that his right to confrontation was violated because

17   the trial court admitted Manning's letter and then failed to instruct the jury not to consider

18   the letter's inculpatory statements against him. (Respondents' Exh. H at 13-15)

19          The Arizona Court of Appeals agreed and found that the trial court's limiting

20   instruction[12] "was confusing in that it appear[ed] to have applied only to the exemplar, not

21   the substantive statement.  Thus, the *Marsh* requirements were not completely satisfied."

22   (Respondents' Exh. L at 21; Exh. MM: Tr. 1/24/01 at 12–15)

23

24

25   ————————————

26   [12]  The trial instructed the jury that: "A letter alleged to have been written by Defendant
     Manning has been introduced in evidence in this case.  Such letter was introduced and may be

27   considered only for the limited purpose of comparing the handwriting with that of the other
     letter whose authorship has not been established.  You are not to consider in any manner the

28   actual content or meaning of such letter."  (Respondents' Exh. MM at 15)

1   The appellate court concluded that any error was harmless and that reversal was not

2   required because the "letter on its face did not directly implicate [Petitioner] in the

3   propagation of or participation in the cover-up scenario," and "[t]he other evidence of the

4   conspiracy and [Petitioner's] participation in it was substantial." (Respondents' Exh. L at

5   21)  Therefore, the appellate court concluded that "we are able to say beyond a reasonable

6   doubt that the trial court's failure to properly instruct the jury pursuant to *Marsh* did not

7   affect the verdict against [Petitioner]."  (*Id.*)

8   Respondents assert that the State court's harmlessness finding was neither contrary

9   to, nor an unreasonable application, of clearly established federal law, and was not based on

10  an unreasonable determination of the facts in light of the evidence.  (docket # 13 at 44)  The

11  Court agrees.

12  A state court's decision is "contrary to" clearly established federal law under

13  § 2254(d)(1) if it "applies a rule that contradicts the governing law set forth in [United

14  States Supreme Court] cases." *Williams*, 529 U.S. at 405–06.  A state court's application of

15  clearly established Supreme Court law is "unreasonable" where the state court identifies the

16  correct governing legal principal but unreasonably applies that principle to the facts of the

17  particular case in an "objectively" unreasonable manner. *Andrade*, 538 U.S. at 75; *Visciotti*,

18  537 U.S. at 27.  Petitioner concedes that the Court of Appeals identified the correct

19  governing federal law, *Bruton* and *Marsh*, but argues that the appellate court applied those

20  cases unreasonably.  (docket # 18 at 54-63) The Court disagrees with Petitioner's assertion

21  and finds that the State court's decision is neither contrary to federal law nor rests on an

22  unreasonable application of federal law.

23  The United States Supreme Court has held that a *Bruton* violation does not

24  automatically require reversal, but rather is subject to harmless-error review.  *Schneble v.*

25  *Florida*, 405 U.S. 427, 430 (1972).  *See also United States v. Sutton*, 794 F.2d 1415, 1428

26  (9th Cir. 1986); *United States v. Steed*, 465 F.2d 1310, 1318 (9th Cir. 1972).  In *Schneble*,

27  the Court stated that, "[i]n some cases the properly admitted evidence of guilt is so

28  overwhelming and the prejudicial effect of the codefendant's admission is so insignificant

1   by comparison, that it is clear beyond a reasonable doubt that the improper use of the

2   admission was harmless error." *Id.* at 405 U.S. at 430.

3          Consistent with controlling United States Supreme Court precedent, the Arizona

4   Court of Appeals recognized that the *Bruton* error in Petitioner's case did not automatically

5   require reversal, but could be considered harmless when "[t]he other evidence of the

6   conspiracy and [Petitioner's] participation in it was substantial," and that it could "say

7   beyond a reasonable doubt that the trial court's failure to properly instruct the jury pursuant

8   to *Marsh* did not affect the verdict against [Petitioner]." (Respondents' Exh. L at 21)

9   Accordingly, the state court's determination was not contrary to, or an unreasonable

10  application of, clearly established federal law.

11         Additionally, the appellate court's determination was not based on an unreasonable

12  determination of the facts in light of the evidence presented at trial.  *See* § 2254(d)(1).  The

13  Manning letter neither directly implicated Petitioner nor confessed his guilt.  Rather, it

14  merely articulated a story to explain the conspirators' actions in defense to the charged

15  offenses.  Additionally, the State presented the following evidence of Petitioner's guilt.

16  Both Robert Olsen and Daniel England testified at length about their conversations with

17  Goldberg and Schilinski, and their plan to help Goldberg escape. (Respondents' Exh. FF at

18  89–124, 163–64; Exh. GG at 7–94) Olsen and England specifically mentioned Schilinski,

19  the Cofsky's, and Manning as being participants in the planned escape.  (*Id.*)  Olsen and

20  England further testified regarding the details of the plan which Goldberg and Schilinski

21  had described to them.  (*Id.*)  The escape attempt was planned for June 12, 2000, at 11:30

22  a.m., when Goldberg was being transported from the courthouse to the jail.  Upon

23  Goldberg's arrival, "two" people in a van with sliding doors were going to drive by and

24  "grab" Goldberg. (*Id.*)  If the guard escorting Goldberg interfered with the escape attempt,

25  Schiliski was to kill the guard.  (*Id.*)  Once Goldberg was inside the van, the conspirators

26  would "cut off" Goldberg's chains, and Goldberg would "change his clothes," before being

27  driven to another "waiting" vehicle, where they would "switch" cars. (*Id.*)

28

1    Petitioner's role in the conspiracy became clear when law enforcement officers, who

2    were conducting surveillance of the Cofsky residence, observed the arrival of Petitioner and

3    co-defendant Tawanee Barrett at the Cofsky residence the night before the planned

4    jailbreak. (Respondents' Exh. HH at 130–35; Exh. JJ at 56–58; Exh. LL at 4–7)  The next

5    morning, June 12, 2000, Petitioner, Barrett, and conspirator Manning drove to Wal-Mart

6    and purchased .38 caliber ammunition.  (Respondents' Exh. HH at 143–49, 167–70; Exh. II

7    at 245–48; Exh. JJ at 19–23; Exh. LL at 22–25)  They proceeded to Auto Zone, and

8    purchased a pair of 18-inch bolt cutters. (*Id.*)  At approximately 11:00 a.m., officers

9    observed Petitioner, Barrett, Manning, and the Cofsky's drive towards Kingman in three

10   different vehicles.  (Respondents' Exh. GG at 185–90; Exh. HH at 150–53, 177) Officers

11   followed the vehicles into Kingman, and saw them drive to an old warehouse parking lot,

12   where Petitioner and Manning removed the back seat of the minivan, and "stash[ed]" it

13   behind the building. (Respondents' Exh. GG at 195, 154–55; Exh. II at 140; Exh. JJ at 76;

14   Exh. LL at 30)  After driving to another location where Barrett remained with one of the

15   vehicles, Petitioner and Manning left in the minivan, and drove towards the courthouse.

16   (Respondents' Exh. GG at 161–63; Exh. II at 118–19, 125–26; Exh. JJ at 59–64; Exh. LL at

17   30–31)  Meanwhile, police observed Schilinski and the Cofskys "casing" the courthouse

18   and jail. (Respondents' Exh. HH at 18–35, 74–75; Exh. II at 25–31, 120–24, 181–83, 190,

19   238–41; Exh. JJ at 61–62) After arresting the Cofskys, police found, among other items, a

20   day planner in Sheri Cofsky's purse which contained Schilinski's name, social security

21   number, and date of birth, Manning's name and phone number, and the name, "Tracy"

22   (Petitioner), with a corresponding number. (*Id.*)

23       When police officers outside of the courthouse observed the minivan drive "right in

24   front" of the courthouse, they initiated a traffic stop. (Respondents' Exh. GG at 160–61,

25   193; Exh. II at 125–32, 242–43; Exh. JJ at 62–69)  Manning was in the driver's seat, and

26   Petitioner was crouched in the "back cargo area" of the van wearing "reflective

27   sunglasses," had seven .38 caliber rounds of ammunition in his pocket, and was holding six

28   more rounds in his hand. (Respondents' Exh. II at 41–42, 129– 32, 244; Exhibit JJ at 66)

1    Officers found two handguns in the van, one loaded with two .38 caliber rounds of

2    ammunition, and a pair of worn surgical gloves. (Respondents' Exh. II at 132–35, 172–81;

3    Exh. JJ at 67)  Inside the vehicle which Barrett was driving when she was arrested, police

4    found: (1) two pairs of bolt cutters; (2) five .38 caliber rounds of ammunition; (3) a pair of

5    rubber gloves similar to the pair found in the minivan; (4) a bag containing "extra large"

6    men's clothing and a can of shaving cream (Goldberg weighed approximately 260 pounds,

7    and had a beard (Tr. 1/18/01, at 73)); (5) cell phones; (6) two license plates; and (7) a court

8    document bearing Eugene Cofsky's name.  (Respondents' Exh. II at 143–162, 223; Exh. JJ

9    at 70–73, 87)

10        At the Cofsky's residence, officers found $117,500 in cash, .38 caliber shell casings,

11   and a receipt from Wal-Mart for .38 caliber ammunition purchased on June 12, 2000 at

12   10:20 a.m. (Respondents' Exh. GG at 196–98; Exh. HH at 37–41, 161–70) Police also

13   found a document with Eugene Cofsky's name and the notation, "left Fourth, end, park

14   van, white Grand Am," apparent driving directions to the courthouse for Petitioner and

15   Manning.[13] (*Id.*) Finally, a telephone calling card taken from Schilinski after his arrest

16   indicated that he called the Cofsky residence at 8:28 a.m. on June 12, 2000 when Petitioner

17   was there. (Respondents' Exh. HH at 166; Exh. II at 48, 184–85)

18        During his interview, Petitioner told police that: (1) he had been at the Cofsky

19   residence on the morning of June 12, 2000; (2) he helped Manning remove the back seat of

20   the minivan; (3) the ammunition found in his pocket matched the ammunition loaded in the

21   handgun that police found in the minivan; and (4) he "handled" at least one of the handguns

22   found in the minivan. (Respondents' Exh. II at 40–47; Exh. JJ at 30–33) When asked why

23

24   _____

25        [13] The minivan was seen driving north on Fourth Street towards the courthouse.
     (Respondents' Exh. II at 125; Exh. JJ at 62–63) The courthouse is located at the intersection of
26   Fourth Street and Spring Street. (*Id.*) The minivan turned east on Spring Street and then north
     on Fifth Street, which borders the courthouse's east side. (*Id.*) The minivan then drove through
27   the intersection of Pine Street, and then made a U-turn back towards the courthouse before
28   being stopped. (*Id.*)

1   he and Manning removed the seat from the van, Petitioner became "upset and agitated" and
2   "no longer wanted to speak after that." (*Id.*)

3         The evidence at trial was sufficient to establish that a conspiracy to commit first-
4   degree murder existed and that Petitioner was a participant in that conspiracy.  As the Court
5   of Appeals found, in view of this evidence, the jury "would not have found the State's case
6   significantly less persuasive had the [Manning letter] been excluded." *Schneble*, 405 U.S. at
7   432.  Assuming that "7 and 7" referred to "T" or Petitioner, the Manning letter merely set
8   forth that one possible defense to the charges was for the co-defendants to claim that
9   Petitioner "showed up" and wanted to steal bikes and that he put guns in the car.
10  (Respondents' Exhs. BB, CC)  Petitioner himself testified that he was in the area of the
11  courthouse on the day in question because he had planned to steal bikes from a nearby
12  elementary school.  (Respondents' Exh. LL at 11, 27-28, 30-32)  In view of the evidence at
13  trial, including Petitioner's testimony, any prejudicial effect of the Manning letter is so
14  "insignificant by comparison" to the evidence of Petitioner's involvement in the crime, that
15  the Arizona Court of Appeals properly concluded that admission of the letter was harmless
16  error. *Id.* at 430.  Petitioner has not established that the State Court's resolution of his
17  confrontation clause claim was based on an unreasonable determination of the facts in light
18  of the evidence or an unreasonable application of federal law.

19        **E.  Ground V - Double Jeopardy**

20        In Ground V, Petitioner argues that his Fifth Amendment "right against double
21  jeopardy" was violated because he was indicted on two separate counts of conspiracy,
22  conspiracy to commit first degree murder and conspiracy to commit first degree escape,
23  "when the evidence demonstrated there was only one conspiracy."  (docket # 1 at 9)

24        Respondents argue that Petitioner's Fifth Amendment challenge to the indictment is
25  procedurally defaulted because he did not raise a challenge to the indictment before trial.[14]

26  _____

27    [14] Respondents further argue that Petitioner's claims are procedurally defaulted because he
    did not raise them before the Arizona Supreme Court. (docket # 13) As previously stated,
28  Petitioner was not required to present any of his federal claims to the Arizona Supreme Court.

1 (docket # 13)  Petitioner's failure to raise a pretrial challenge to the indictment itself

2 resulted in a waiver of that claim under Arizona Law.  *See*, Ariz. R.Crim. P. 13.5, 16.1(b),

3 (c); *accord State v. Anderson*, 210 Ariz. 327, 335-36, 111 P.3d 369 (2005) (precluding a

4 defendant from challenging an indictment as duplicitous where an objection had been made

5 during, but not before, trial).  However, contrary to Respondents' argument, Petitioner's

6 failure to object to the multiplicitous indictment at trial did not waive a *double jeopardy*

7 objection to imposition of multiple sentences. *See Launius*, 575 F.2d at 772.  As discussed

8 below, however, Petitioner is not entitled to relief on his Fifth Amendment claim because

9 he has already been afforded the appropriate relief.

10         On direct appeal, Petitioner argued that the indictment was multiplicitous because it

11 included "two counts of A.R.S. § 13-1003 for one conspiracy."  (Respondents' Exh. E at

12 35) He further argued that "Judge Conn sentencing [Petitioner] for conspiracy to commit

13 first degree murder and conspiracy to commit escape in the first degree, even though

14 concurrently, violated A.R.S. § 13-1003(C) and [his] Fifth Amendment Rights."

15 (Respondents' Exh. E at 37)

16         The appellate court specifically addressed Petitioner's challenge to the multiplicitous

17 indictment.  Although the appellate court did not specifically mention Petitioner's Fifth

18 Amendment challenge, it construed Petitioner's argument as alleging that "his convictions

19 and sentences for both conspiracies cannot stand." (Petitioner's Exh. C at 18-19) The Court

20 of Appeals agreed with Petitioner's assertion that the indictment was multiplicitous.

21 (Petitioner's Exh. C at 18)  In so finding the court explained that under Arizona law, it is

22 the agreement to commit an offense which is punished by the conspiracy statute.

23 (Petitioner's Exh. C at 18)

24         Arizona Revised Statute § 13-1003(C)(2001) provided that:

25         A person who conspires to commit a number of offenses is guilty of only
           one conspiracy if the multiple offense are the object of the same agreement
26

27 ─────────────────────

28 Rather, for purposes of § 2254, an Arizona prisoner in a non-capital case, exhausts his claims
   by presenting them to the Arizona Court of Appeals.

1

or relationship and the degree of the conspiracy shall be determined by the
most serious offense conspired to.

2

3

(Respondents' Exh. L at 18; Petitioner's Exh. C at 18)(citing A.R.S. § 13-1003(C)(2001).

4

Whether there are separate conspiracies to commit multiple offenses is a question of fact.

5

The Court of Appeals concluded that the evidence made it "abundantly clear that there was

6

only one conspiracy in this case, and that the most-serious offense conspired to was first-

7

degree murder." (Petitioner's Exh. C at 19) The Arizona Court of Appeals, therefore,

8

vacated the less serious of the two convictions, conspiracy to commit escape, and the

9

related sentence. (*Id.*) The court concluded that "this action eliminates any prejudice

10

[Petitioner] suffered from being convicted more than once for a single conspiracy and,

11

consequently, this is the only relief to which [Petitioner] is entitled." (*Id.*)

12

On review before the Arizona Supreme Court, Petitioner argued that he was

13

prejudiced by the multiplicitous indictment and that the Court of Appeals order vacating his

14

conviction and sentence for conspiracy to commit escape did not cure that prejudice.

15

(Respondents' Exh. M at 9-10) Petitioner, however, did not raise a Fifth Amendment claim

16

before the Arizona Supreme Court. (*Id.*) Additionally, the cases which Petitioner cited in

17

support of his prejudice claims did not address the issue on Fifth Amendment grounds.

18

(Respondents' Exh. M at 9-10) The Arizona Supreme Court summarily denied review.

19

(Petitioner's Exh. E) Accordingly, the Arizona Court of Appeals' decision is the last

20

reasoned decision of the State courts regarding Petitioner's Fifth Amendment claim. As

21

discussed below, Petitioner has not shown that the Arizona Court of Appeals' decision is

22

contrary to or involved an unreasonable application of federal law.

23

Even if Petitioner's challenge to the indictment itself were properly before this

24

Court, that claim does not entitle Petitioner to habeas corpus relief. "An indictment is

25

multiplicitous when it charges multiple counts for a single offense, producing two penalties

26

for one crime and thus raising double jeopardy questions." *United States v. Stewart*, 420

27

F.3d 1007, 1012 (9th Cir.2005). Multiplicity is a defect in the indictment; therefore, a

28

conviction will not be reversed unless the defendant was prejudiced. *See United States v.*

1    *Severino*, 316 F.3d 939, 943 (9th Cir.2003).  Here, although the indictment was

2    multiplicitous, any prejudice Petitioner may have suffered was cured when the Arizona

3    Court of Appeals vacated Petitioner's conviction and sentence on conspiracy to commit

4    escape.  *See, United States v. Davenport*, 519 F.3d 940 (9ᵗʰ Cir. 2008) (finding that offense

5    of possessing child pornography was lesser included offense of receipt of child

6    pornography, and thus entering judgment against defendant on separate counts for

7    receiving child pornography and possessing child pornography was multiplicitous, in

8    violation of Fifth Amendment's prohibition of double jeopardy and remanding to the

9    district court to vacate defendant's conviction on one of the two counts and allowing that it

10   be reinstated without prejudice if his other conviction should be overturned on direct or

11   collateral review).

12        Petitioner also argues that, under the Fifth Amendment's double jeopardy clause, he

13   cannot be subject to multiple punishment on multiplicitous charges.  In support of this

14   claim, Petitioner cites *Braverman v. United States*, in which the Supreme Court stated that

15   "one agreement cannot be taken to be several agreements and hence several conspiracies

16   because it envisages the violation of several statutes rather than one . . . . The single

17   agreement is the prohibited conspiracy, and however diverse its objects it violates but a

18   single statute . . . . For such a violation, only the single penalty prescribed by the statute can

19   be imposed." *Braverman*, 317 U.S. 49, 53-54 (1942); *see also United States v. Licciardi*, 30

20   F.3d 1127, 1131 (9th Cir.1994) (holding that indictment is multiplicitous if it charges

21   multiple conspiracies when there is only a single conspiracy to violate two statutes);

22   *Launius v. United States*, 575 F.2d 770, 771 (9th Cir.1978) (*per curiam*) (holding that

23   consecutive sentences imposed on multiplicitous counts - two counts of conspiracy for one

24   drug smuggling enterprise - violated Double Jeopardy Clause).

25        In this case, the Court of Appeals found that the evidence made it "abundantly clear

26   that there was only one conspiracy in this case, and that the most-serious offense conspired

27   to was first-degree murder." (Respondents' Exh. L at 19; Petitioner's Exh. C at 19)  The

28

1    Arizona Court of Appeals, therefore, vacated the less serious of the two convictions,

2    conspiracy to commit escape, and the related sentence. (*Id.*)

3          In accordance with United States Supreme Court precedent, the Ninth Circuit

4    recognizes that when a defendant has been convicted and sentenced on mulitiplicitous

5    charges, "[t]he conviction as well as the sentence on one of the two mulitiplicitous counts

6    must be vacated, to 'avoid both the punitive collateral effects of multiple convictions as

7    well as the direct effects of multiple sentences.'" *United States v. Alerta*, 96 F.3d 1230,

8    1239 (9th Cir. 1996), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053

9    (9th Cir. 2000) (quoting *United States v. Anderson*, 850 F.2d 563, 569 (9th Cir. 1988) and

10   quoting *United States v. Palafox*, 764 F.2d 558, 564 (9th Cir. 1986)); *see also Rutledge v.*

11   *United States*, 517 U.S. 292 (1996)(holding that "[a] guilty verdict on a § 848 charge

12   necessarily includes a finding that the defendant also participated in a conspiracy violative

13   of § 846; conspiracy is therefore a lesser included offense. . . . we adhere to the

14   presumption that Congress intended to authorize only one punishment. Accordingly, 'one

15   of [petitioner's] convictions, as well as its concurrent sentence, is unauthorized punishment

16   for a separate offense' and must be vacated.")(internal citation omitted).

17         Here, because the Arizona Court of Appeal already vacated one of Petitioner's

18   convictions and the related sentence, he has been afforded the relief to which he is entitled

19   and, therefore, is not entitled to further relief based on his challenges to the indictment.

20         **F. Ground VI - Fourteenth Amendment**

21         In Ground VI, Petitioner argues that the trial court violated the Fourteenth

22   Amendment by admitting into evidence sales receipts from Wal-Mart and Auto Zone.  At

23   trial, however, Petitioner only objected to the admission of the Wal-Mart receipt on

24   "relevance" and "hearsay" grounds, and to the admission of the Auto Zone receipt on

25   "foundation" grounds. (Tr. 1/12/01, at 168–69; Tr.1/17/01, at 245–48) *See Estelle v.*

26   *McGuire*, 502 U.S. 62, 67–68 (1991) (state evidentiary rulings not cognizable in federal

27   habeas proceedings).  Petitioner never objected on constitutional grounds.  Petitioner raised

28   the instant federal constitutional claim for the first time in his opening brief to the Arizona

1    Court of Appeals (Respondents' Exh. E at 25).  However, Petitioner merely referred to the

2    Fourteenth Amendment, but cited to the Arizona Rules of Evidence and to Arizona and

3    other state-court case law in support of his claim. (Respondents' Exh. E at 25-28)  The

4    Arizona Court of Appeals resolved the claim on the basis of state law.  (Respondents' Exh.

5    L at 11-12) The appellate court ruled that the two sales receipts did not meet the

6    requirements for admission as business records under Ariz.R.Evid. 803(6).  (Respondents'

7    Exh. L at 11) However, the appellate court found that admission of the receipts was

8    harmless error.  Petitioner contended that the sales receipts were crucial to the State's

9    ability to connect him to the conspiracy.  (Respondents' Exh. L at 12) The appellate court

10   rejected this contention concluding that the "critical evidence was the ammunition and the

11   bold cutter themselves. These were the items necessary to carry the plan to fruition, not

12   receipts evidencing their purchase. And defendant was caught red-handed in actual or

13   constructive possession of these items."  (Respondents' Exh. L at 12)

14         Similarly, although Petitioner argued in his petition for review to the Arizona

15   Supreme Court that "[b]ut for the receipts [Petitioner] had a viable mere presence

16   defense that would have changed the verdict," he did not assert a Fourteenth

17   Amendment constitutional violation. (Respondents' Exh. M) Petitioner cited to Arizona

18   and other state cases in support of his claim.  (*See Id.* at 7) (citing *State v. Denman*, 186

19   Ariz. 390, 392, 923 P.2d 856, 858 (App.1996) (discussing whether there was sufficient

20   evidence to support defendant's conspiracy to commit murder conviction); and *Dickeson v.*

21   *State*, 843 P.2d 606, 607–12 (Wyo. 1992) (discussing whether defendant's counsel was

22   ineffective)). *See Casey*, 386 F.3d at 912 n.12 (state appellate judges not required to read all

23   cases that are cited in the cases on which a petitioner relies).

24         The record reveals that, although Petitioner mentioned the Fourteenth Amendment

25   on direct appeal, he presented a state law claim which was resolved on state-law grounds.

26   Petitioner's mere reference to the Fourteenth Amendment was insufficient to fairly present

27   a federal claim.  *See Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir. 2000); *Gray v.*

28   *Netherland*, 518 U.S. 152, 162-63 (1996). Consequently, Petitioner did not properly

1 exhaust a federal claim in state court. *See Reese*, 541 U.S. at 32.  And, as discussed in

2 Section V, *infra*, that claim is procedurally barred.

3        Moreover, Petitioner has not shown that the Arizona Court of Appeals decision is

4 contrary to, or an unreasonable application of, federal law or based on an unreasonable

5 determination of the facts.  Even if admission of the sales receipts into evidence would

6 have violated federal law, Petitioner is not entitled to habeas corpus relief on that basis.  As

7 the appellate court found, the bolt cutters and ammunition were found in Petitioner's

8 "actual or constructive possession" and linked him to the conspiracy.  Police found the bolt

9 cutters in the Moutaineer which they had observed Petitioner driving a short time before the

10 bolt cutters were found in the vehicle.  (Respondents' Exh. GG at 160-61, 167,185-194;

11 Exh. HH at 150-53, 177; Exh. II at 129-32, 223, 244; Exh. LL at 29-30, 45-46; Exh. JJ at

12 70-73, 87) Moreover, Petitioner himself testified that he had accompanied Manning to Auto

13 Zone to purchase bolt cutters, but claimed that they were for use in constructing a fence.

14 (Respondents' Exh. LL at 24-25)

15        When police arrested Petitioner, he had seven rounds of .38 ammunition in his

16 pocket, and was holding six more rounds in his hand.  (Respondents' Exh. II at 41-42, 131;

17 Exh. JJ at 66) In the van in which Petitioner was riding at the time of his arrest, police

18 found an additional two rounds of .38 ammunition.  (Respondents' Exh. II at 132-35, 172-

19 81; Exh. JJ at 67).

20        As the Court of Appeals found, the sales receipts themselves were not the sole

21 evidence tying Petitioner to the ammunition and the bolt cutters.  Petitioner has not shown

22 that the State court's rejection of his claim based on the admission of the sales receipts is

23 contrary to, or rests on an unreasonable application of, federal law, or that it rests on an

24 unreasonable determination of the facts.  Accordingly, Petitioner is not entitled to habeas

25 corpus relief based on his Fourteenth Amendment claim.

26        **G.  Grounds VII, XI(B), XIV(A), (B), (D), (E), XV(B), (C), (D), (E), XVII,
   XVIII(B), XIX, XX, XXII, and XXIII - Ineffective Assistance of Counsel**

27 Petitioner asserts several claims of ineffective assistance of trial counsel:

28

**Ground VII**: trial counsel failed to file a "motion to reconsider" in the Arizona Court of Appeals based on the Arizona Supreme Court's decision in *Evanchyk*;

**Ground XI(B)**: trial counsel erroneously advised Petitioner that Schilinski's and Goldberg's statements "could [not] be used against [him] at trial";

**Ground XIV**: **(A)** trial counsel failed to object to Olsen's "speculative" testimony "as to why he felt Goldberg and Schilinski weren't just bragging about shooting a guard, his response to letter written to Cathy Ambrosio [Olsen's drug therapy counselor], and Olsen's vouching for the credibility of the conspirator statements";

**(B)** trial counsel "failed to object to Officer Reif's speculation about Schilinski's demeanor";

**(D)** trial counsel "failed to object to Olsen's testimony that he was concerned they were going to kill guard"; and

**(E)** trial counsel "failed to object or request anything from the judge regarding the overwhelming show of force by law enforcement at the close of the State's evidence at the end of the trial";

**Ground XV**: trial counsel failed to request jury instructions on **(B)** the lesser included offenses of "solicitation and facilitation"; **(C)** a cautionary instruction on the "overwhelming police presence at the close of trial"; **(D)** "specific intent"; and **(E)** "co-conspirator liability" in Arizona.

(docket # 1 at 11-19)

Petitioner also argues that he was denied his Sixth Amendment right to effective assistance of appellate counsel based on the following:

**Ground XVII**: appellate counsel "failed to articulate facts, reasons and authority for the contention in the appellate brief argument section of [his] appeal" that the trial judge should have recused himself;

**Ground XVIII(B)**: appellate counsel "failed to argue that the condition precedent for admission of the [Schilinski] statements did not exist";

**Ground XIX**: appellate counsel "failed to adequately present the factual record indicative of evidence adduced at trial that the letter authored by co-defendant Manning did, in fact, directly implicate [Petitioner]";

**Ground XX**: appellate counsel "failed to properly present facts and argument as to why the denial of a motion to continue amounted to an abuse of discretion in violation of the Fourteenth Amendment";

**Ground XXII**: appellate counsel "failed to adequately present facts and argument regarding the extent to which the multiplicitous indictment prejudiced [Petitioner]," and "failed to properly distinguish the facts of *Ward v. United States*";

**Ground XXIII**: appellate counsel failed to file a "motion to reconsider" in the Arizona Court of Appeals based on the Arizona Supreme Court's holding in *Evanchyk*.

1    (docket # 1 at 21-27)

2         Although Petitioner raised these Sixth Amendment claims before the trial court in

3    his petition for post-conviction relief (Respondents' Exh. P), he did not raise them in his

4    petition for review to the Arizona Court of Appeals. (Respondents' Exhs. S and U.)

5    Consequently, Grounds VII, XI(B), XIV(A), (B), (D), (E), and XV(B), (C), (D), (E), XVII,

6    XVIII(B), XIX, XX, XXII, and XXIII were not properly exhausted in state court. *See*

7    *Reese*, 541 U.S. at 32; *Boerckel*, 526 U.S. at 845; *Galvan v. Alaska Dep't. of Corrections*,

8    397 F.3d 1198, 1204 (9th Cir. 2005)(noting that failure to cite *Strickland* or Sixth

9    Amendment indicates that petitioner elected to make his claim under state, rather than

10   federal, law.)  And, as discussed below in Section V, these claims are barred from federal

11   habeas corpus review.

12        **H. Grounds VIII, IX, X, XII, XIII, XIV(C), XV(A), XVIII(A), and XXI**

13        Petitioner also argues he was denied his Sixth Amendment right to effective

14   assistance of trial counsel based on the following:

15        **Ground VIII**: trial counsel failed to timely request a change of judge;

16        **Ground IX**: trial counsel failed to object to the multiplicitous indictment;

17        **Ground X**: trial counsel failed to object to the admission of Schilinski statements
18   on the grounds that Petitioner was not a member of the conspiracy;

19        **Ground XII**: trial counsel "failed to interview witnesses prior to trial";

20        **Ground XIII**: trial counsel "failed to request an adequate instruction pursuant to
     *Richardson v. Marsh*";

21        **Ground XIV(C)**: trial counsel "failed to object to officer McNally's testimony that
22   "7 and 7" could mean "T and T" in the Manning letter";

23        **Ground XV(A)**: trial counsel failed to request a jury instruction on the lesser
     included offense of conspiracy to commit aggravated assault;

24        **Ground XVIII(A)**: appellate counsel failed to include the transcript of co-defendant
     Sheri Cofsky's hearing (1/3/01) on her motion to preclude England's testimony
25   regarding Schilinski's statements;

26        **Ground XXI**: appellate counsel failed to timely present the probable cause issue to
     the Arizona Court of Appeals.

27

28

1    (docket # 1 at 12-19, 22, 25)  Although Petitioner raised these Sixth Amendment claims

2    before the trial court in his petition for post-conviction relief (Respondents' Exh. P), he did

3    not present them as Sixth Amendment claims on review to the Arizona Court of Appeals.

4    (Respondents' Exh. S)  Petitioner neither asserted a Sixth Amendment violation, nor cited

5    any case law involving the legal standard for a Sixth Amendment ineffective assistance of

6    counsel claim. (*Id.*)  Rather, Petitioner merely argued that the trial court "abused its

7    discretion" in denying relief, that its rulings were "erroneous," or that he was "entitled" to

8    an evidentiary hearing. (*Id.* at 6, 7, 8, 9, 10)  Petitioner merely asserted that trial and

9    appellate counsel were "ineffective."  Such allegations were not sufficient to fairly present

10   a Sixth Amendment claim to the state courts.  *See Galvan*, 397 F.3d at 1204 (no fair

11   presentment where petitioner's brief did not state that she was "deprived of her Sixth

12   Amendment right to the assistance of counsel.") The Ninth Circuit has explained that:

13           Briefing a case is not like writing a poem, where the message may be conveyed
             entirely through allusions and connotations. . . . If a party wants a state court to
14           decide whether she was deprived of a federal constitutional right, she has to say
             so.  It has to be clear from the petition filed at each level in the state court system
15           that the petitioner is claiming the violation of the federal constitution that the
             petitioner subsequently claims in the federal habeas petition.  That is, 'the
16           prisoner must fairly present his claim in each appropriate state court . . . thereby
             alerting that court to the federal nature of claim.'  If she does not say so, then she
17           does not 'fairly present' the federal claim to the state court.

18   *Galvan*, 397 F.3d 1198, 1204 (9th Cir. 2005) (citing *Baldwin*, 541 U.S. at 29–32).  See

19   *Baldwin*, 541 U.S. at 29-32 (holding that habeas petitioner failed to "fairly present" a claim

20   of ineffective assistance of counsel by merely labeling counsel's performance as

21   "ineffective," without any accompanying reference to federal law or to a citation to an

22   opinion applying federal law); *Lyons*, 232 F.3d at 668–70 (mere reference to "ineffective

23   assistance of counsel" is not sufficient to fairly present a Sixth Amendment claim).

24           Additionally, the Arizona Court of Appeals was not required to review the petition

25   for post-conviction relief which Petitioner had filed in the trial court to determine whether

26   he was raising a federal claim. *See Castillo*, 399 F.3d at 1000 ("[T]he Arizona Court of

27   Appeals was not required to review the parties' trial court pleadings to see if it could

28   discover for itself a federal, constitutional issue."). Such requirements would "force state

1   appellate judges to alter their ordinary review practices," and "impose a serious burden

2   upon judges of state appellate courts." *Reese*, 541 U.S. at 31. Consequently, Grounds VIII,

3   IX, X, XII, XIII, XIV(C), XV(A), XVIII(A), and XXI were not properly exhausted in state

4   court. *See Reese*, 541 U.S. at 32; *Boerckel*, 526 U.S. at 845.  As discussed in Section V,

5   *infra*, those claims are barred from federal habeas corpus review.

6            **I. Ground XVI - Sixth Amendment Right to Counsel**

7            In Ground XVI, Petitioner argues that his Sixth Amendment right to effective

8   assistance of trial counsel was violated because trial counsel "failed to contact Schilinski

9   prior to trial to demonstrate [Petitioner] was not a member" of the conspiracy.   (docket # 1

10  at 20)

11           Petitioner did not properly exhaust this claim because he did not present this

12  particular claim of ineffective assistance in the state courts.  *Carriger*, 971 F.2d at 333-34;

13  *Paggageorge v. Sumner*, 688 F.2d 1294 (9th Cir. 1982).  Ineffective assistance claims

14  different from those presented to the state courts are precluded from consideration on

15  habeas corpus review.  *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1305-06 (9th Cir. 1996);

16  *Pappageorge*, 688 F.2d at 1294.  In his supplemental petition for post-conviction relief,

17  Petitioner argued that trial counsel was ineffective for failing to obtain evidence that

18  Petitioner was not a member of the conspiracy and for failing to submit that evidence to the

19  trial court before it ruled on the motion *in limine* to preclude Schilinski's statements.

20  (Respondents' Exh. Q)  Petitioner explained that: "Trial counsel at no time attempted to

21  contact Schilinski to see what his testimony would be as to who was a member of the

22  conspiracy." (*Id.* at 1-2)  Petitioner, however, did not allege a Sixth Amendment violation,

23  did not cite the United States Constitution, and did not cite any federal or state case law

24  involving the legal standard for a Sixth Amendment ineffective assistance of counsel claim.

25  (Respondents' Exh. Q)  *See Castillo*, 399 F.3d at 999. Petitioner merely alleged that trial

26  counsel was "ineffective." (*Id.*) This was not sufficient to present a federal constitutional

27  claim to the state court. *See Reese*, 541 U.S. at 29–32; *Lyons*, 232 F.3d at 668–70; *Galvan*,

28  397 F.3d at 1204.

1    Additionally, in his petitions for review to the Arizona Court of Appeals and the

2    Arizona Supreme Court, Petitioner did not raise the Sixth Amendment ineffectiveness

3    claim which he asserts in the pending Petition.  (Respondents' Exhs. S and U)  Rather, on

4    appeal of the denial of his petition for post-conviction relief, Petitioner, at argued that "the

5    trial court abused its discretion in failing to grant an evidentiary hearing regarding trial

6    counsel's ineffectiveness for his failure . . . to lodge an objection to the admission of co-

7    conspirator's statements." (*Id.*; Exh. S at 2, 7)

8    Consequently, Petitioner's assertion in Ground XVI that trial counsel was ineffective

9    based on his failure to contact Schilinski before trial and for failing to obtain evidence that

10   Petitioner was not a member of the conspiracy, was not properly exhausted in state court.

11   *See Reese*, 541 U.S. at 32; *Boerckel*, 526 U.S. at 845.  Petitioner's assertion of a claim of

12   ineffective assistance of counsel based on one set of facts, does not exhaust other claims of

13   ineffective assistance based on different facts.  *Gauf v. Ontiveres*, No. CV-06-804-PHX-

14   DGC (JCG), 2007 WL 1713287, * 5 (D.Ariz., June 12, 2007).  As discussed in Ground V,

15   *infra*, this claim is procedurally barred from federal habeas corpus review.

16   **J.  Ground XXIV - Fourteenth Amendment Claim**

17   In Ground XXIV, Petitioner argues that the Arizona Supreme Court's decision in

18   *Evanchyk v. Stewart*, 202 Ariz. 476, 47 P.3d 1114 (2002), represented a significant change

19   in the law and, if applied to his case, would have changed the outcome.  (docket # 1 at 28)

20   Petitioner asserts that his Fourteenth Amendment rights were violated because his

21   conviction for conspiracy to commit first-degree murder cannot stand under the rule

22   announced in *Evanchyk*.[15]

23

24   [15]In *Evanchyk*, the Arizona Supreme Court answered the following certified questions: (1)

25   "Under Arizona law, may a defendant be convicted of conspiracy to commit first-degree murder
     when that conviction is based only on the commission of felony murder?"; (2) "Under Arizona

26   law, if the defendant could be convicted of conspiracy to commit first-degree murder, must that
     defendant have possessed an intent to kill?"; and (3) "Under Arizona law, may a defendant be

27   convicted of conspiracy to commit first-degree murder if he had merely the requisite intent to

28   commit the underlying felony?" 202 Ariz. at 478–79, ¶ 6, 47 P.3d at 116–17. The court

1    Respondents assert that federal review of this claim is procedurally barred because

2    Petitioner did not properly present this federal claim to the State courts.  The Court agrees.

3    Petitioner did not raise this Fourteenth Amendment claim either on direct appeal or on post-

4    conviction review.  (Respondents' Exhs L, P, S at 5-6, U)  Rather, he argued that pursuant

5    to the Arizona Supreme Court's decision in *Evanchyk*, his conviction must be vacated.  (*Id.*)

6    Petitioner did not present a federal claim to the state courts.  In his pending petition,

7    although Petitioner mentions the Fourteenth Amendment, he relies on State law to support

8    his claim that his conviction cannot stand.  (docket # 1 at 28)  A habeas petitioner may not

9    "transform a state law issue into a federal one merely by asserting a due process violation."

10   *Poland v. Stewart*, 169 F.3d 573, 584 (9th Cir. 1999) (quoting *Langford v. Day*, 110 F.3d

11   1380, 1389 (9th Cir.1996)).  Moreover, the record reflects that Petitioner has not exhausted

12   the Fourteenth Amendment due process claim asserted in Ground XXIV.  As discussed in

13   Section V, *infra*, this claim is procedurally barred from federal habeas corpus review.  *See*

14   *Reese*, 541 U.S. at 32; *Boerckel*, 526 U.S. at 845; *Windham*, 163 F.3d at 1101.

15           **K.  Ground XI(A) - Ineffective Assistance**

16           In Ground XI(A), Petitioner asserts that trial counsel was ineffective in violation of

17   the Sixth Amendment because he advised Petitioner that he could not be found guilty of

18   conspiracy to commit first degree murder based on conditional intent.   Petitioner contends

19   that based on counsel's erroneous advice, he rejected the State's plea offer.  He further

20   argues that if trial counsel had "correctly interpreted the law," Petitioner "could have made

21   a knowing, voluntary and intelligent decision whether or not to proceed to trial and avoid a

22   life sentence."  (docket # 1 at 15)

23           Respondents concede that Petitioner fairly presented this Sixth Amendment claim to

24   the State courts on post-conviction review and that it is properly before this Court on

25   habeas corpus review.  (docket # 13 at 38)

26

27   ───────────────

28   answered the first and third questions in the negative, and the second question in the affirmative.
     *Id.* at 481, ¶ 481, 47 P.2d at 1119.

**A. Legal Standard**

To establish ineffective assistance of counsel, petitioner must establish that: (1) counsel's performance fell below objective standards of reasonableness and "outside the wide range of professionally competent assistance"; and (2) that counsel's performance prejudiced him by creating "a reasonable probability that absent the errors the fact finder would have had a reasonable doubt respecting guilt." *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984). In the context of pleas and the plea process, ineffective assistance of counsel claims similarly require a showing of both deficient performance and resulting prejudice. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

When analyzing the performance prong of the *Strickland* standard, a reviewing court engages a strong presumption that counsel rendered adequate assistance, and exercised reasonable professional judgment in making decisions. *Strickland*, 466 U.S. at 690. The review of counsel's performance under *Strickland* is "extremely limited": "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998) (emphasis added). Thus, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. If the prisoner is able to satisfy the performance prong, he must also establish prejudice. *Strickland*, 466 U.S. at 691–92; *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000) (burden is on defendant to show prejudice).

A court need not determine whether counsel's performance was deficient before examining whether prejudice resulted from the alleged deficiencies. *Robbins*, 528 U.S. at 286. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* (quoting *Strickland*, 466 U.S. at 697). To establish prejudice, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the

1    proceedings would have been different." *Strickland*, 466 U.S. at 694. When a petitioner

2    alleges that he rejected a plea offer based on counsel's erroneous advice, he must show that,

3    "but for counsel's error, he would have pleaded guilty and would not have insisted on

4    going to trial." *Turner v. Calderon*, 281 F.3d 851, 879 (9th Cir. 2002) (citing *Hill*, 474 U.S.

5    at 59); *Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995).

6          **B.  Analysis of Ground XI(A)**

7          As previously stated, Petitioner alleges that trial counsel erroneously advised him

8    that he could not be convicted of conspiracy to commit murder based only on conditional

9    intent and that he rejected the State's plea offer based on counsel's advice. (docket # 1 at

10   15)

11         Petitioner raised this same claim in his petition for post-conviction relief.

12   (Respondents' Exh. P) In support of his petition for post-conviction relief, Petitioner

13   submitted an affidavit avowing that: (1) before trial, the State offered him a plea, whereby

14   he could "plead guilty to conspiracy to commit escape" and receive "a six year sentence;"

15   (2) trial counsel advised Petitioner that he "would not be convicted of conspiracy to commit

16   first degree murder," a "specific" intent offense, based merely on "conditional" intent; (3)

17   "the evidence did not demonstrate in this case that 'specific' intent existed, only a

18   "conditional" intent;" and (4) Petitioner relied on trial counsel's advice when he rejected

19   the State's plea offer and proceeded to trial.  (Respondents' Exh. EE)

20         The trial court found that Petitioner's trial counsel was not deficient in advising

21   Petitioner of the State's plea offer.  (Respondents' Exh. R at 13)  As discussed below, the

22   state court's determination was neither contrary to, nor an unreasonable application of,

23   clearly established federal law, nor was it based on an unreasonable determination of the

24   facts in light of the evidence.  28 U.S.C. § 2254(d). Assuming that trial counsel advised

25   Petitioner that he could not be convicted of conspiracy to commit first degree murder based

26   on conditional intent, as Petitioner claims, counsel's  advice did not fall below an objective

27   standard of reasonableness.

28

The State of Arizona charged Petitioner with conspiracy to commit first degree murder under A.R.S. §§ 13–1003 and 13–1105.  Arizona Revised Statute § 13–1105 (2000) provides that a person commits first degree murder if "[i]ntending or knowing that the person's conduct will cause death, the person causes the death of another with premeditation."  *Id.*  A person commits conspiracy if, "with the intent to promote or aid the commission of an offense, such person agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense and one of the parties commits an overt act in furtherance of the offense, except that an overt act shall not be required if the object of the conspiracy was to commit any felony upon the person of another." A.R.S. § 13–1003.

At the time of Petitioner's trial in 2001, first degree murder, as defined in A.R.S. § 13–1105, was considered a "specific intent" crime which required the specific intent to kill another person. *See State v. Murray*, 184 Ariz. 9, 32, 906 P.2d 542, 565 (1995); *State v. Fisher*, 176 Ariz. 69, 79, 859 P.2d 179, 189 (1993); *State v. Cook*, 170 Ariz. 40, 49, 821 P.2d 731, 740 (1991); *State v. Lavers*, 168 Ariz. 376, 389, 814 P.2d 333, 346 (1991); *State v. Hall*, 129 Ariz. 589, 594, 633 P.2d 398, 403 (1981); *State v. Means*, 115 Ariz. 502, 504, 566 P.2d 303, 305 (1977); *see generally* A.R.S. § 13–1105.  At that time, Arizona courts had not addressed whether "conditional" intent satisfied the *mens rea* of a "specific" intent crime.  States which had addressed that issue were split.  *Compare, e.g., State v. Irwin*, 285 S.E.2d 345, 349 (N.C. 1982) and *State v. Kinnemore*, 295 N.E.2d 680, 681–83 (Ohio App. 1972) (both holding that conditional intent not sufficient to satisfy *mens rea* for specific intent crime assault with the intent to kill); with *Holloway v. United States*, 526 U.S. 1, 9–11 (1999) (holding that conditional intent sufficient to satisfy specific intent *mens rea* in federal carjacking statute); *People v. Vandeliner*, 481 N.W.2d 787, 788–89 (Mich. 1992) (holding that conditional intent sufficient to satisfy specific intent *mens rea* for solicitation to commit murder offense).

It is "universally recognized" that "an attorney is not liable for an error of judgment on an unsettled proposition of law."  *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir.

1    1999) (citation omitted).  Thus, "giving . . . legal advice that later is proven to be incorrect

2    [] does not necessarily fall below the objective standard of reasonableness." *Id.*  At the time

3    of Petitioner's trial, Arizona courts had not addressed whether a defendant could be

4    convicted for a specific intent crime based on conditional intent.   There were no reported

5    Arizona decisions providing guidance on this issue, and other states were split on this issue.

6    As Petitioner himself noted in his pleadings filed in State court, Arizona law on this issue

7    was unsettled.  (Respondents' Exh. M at 8; Exh. S at 8) Thus, Petitioner's trial counsel had

8    to rely on the plain language of the relevant statute, A.R.S. § 13-1105, and case law

9    discussing that statute.  At the time of Petitioner's trial, the governing law indicated that a

10   defendant must have specific intent, not conditional intent, to kill in order to be found

11   guilty of conspiracy to commit first degree murder pursuant to A.R.S. § 13-1105 and § 13-

12   1003.  *See Murray*, 184 Ariz. 9, 906 P.2d 542.  In view of the prevailing Arizona law,

13   counsel's advice to Petitioner did not fall below an objective standard of reasonableness.

14   *See Smith*, 170 F.3d at 1053–56 (rejecting petitioner's claim that trial counsel's

15   performance was deficient for erroneously advising him that his out-of-state conviction

16   could not be used to enhance his sentence "in light of the uncertainty in Florida law at the

17   time the advice was given," including the fact that there were no reported appellate

18   decisions providing guidance, making it a "live issue in Florida law."); *Johnson v. Carroll*,

19   327 F.Supp.2d 386, 398 (D. Del. 2004) (trial counsel's failure to object admission of drug

20   courier profile testimony was not deficient performance "[given the unsettled nature of this

21   issue at the time of Petitioner's trial," including the fact that Delaware courts had not yet

22   addressed whether such evidence was admissible, and there was a split of authority in the

23   federal courts); *Enoch v. Gramley*, 861F.Supp. 718, 747–48 (C.D. Ill. 1994) (counsel's

24   mistaken interpretation of state law not so unreasonable as to constitute Sixth Amendment

25   violation even where counsel's conclusion was contrary to clear language of statute and

26   uniform case law); *see also Cianbro Corp v. Jeffcoat & Martin*, 804 F.Supp. 784, 790 (D.

27   S.C. 1992) ("[A]n attorney cannot be held liable for following the plain terms of a statute

28

1    when there are not compelling circumstances to suggest [otherwise,]" even when a court

2    later decides that interpretation is erroneous).

3          Moreover, even assuming counsel's performance was deficient, it did not prejudice

4    Petitioner.  To establish prejudice in the context of the plea process, Petitioner must show

5    that, "but for counsel's error, he would have pleaded guilty and would not have insisted on

6    going to trial." *Turner*, 281 F.3d at 879 (citing *Hill*, 474 U.S. at 59).  Petitioner has not

7    established that he "would have" pleaded guilty absent trial counsel's advice that he could

8    not be found guilty of conspiracy to commit first-degree murder based on conditional

9    intent.  In his Petition, Petitioner only asserts that "[h]ad counsel correctly interpreted the

10   law, I could have made a knowing, voluntary and intelligent decision *whether or not* to

11   proceed to trial." (docket # 1 at 15) (emphasis added)  This allegation is insufficient to

12   establish prejudice.  *See Hill*, 474 U.S. at 60 (petitioner's allegations insufficient to

13   establish prejudice under *Strickland* where he did not allege in his habeas petition that, had

14   counsel correctly advised him, he "would have" pleaded guilty); *Turner*, 281 F.3d at 879

15   (petitioner must show that, "but for counsel's error, he would have pleaded guilty and

16   would not have insisted on going to trial.").  Similarly, Petitioner's avowal in his affidavit

17   attached to his petition for post-conviction relief (Respondents' Exh. EE) that he "relied

18   on" his trial counsel's advice and "rejected the plea agreement based on same and

19   proceeded to trial" is also insufficient to establish prejudice.  Petitioner's affidavit is merely

20   a self-serving, conclusory statement which lacks supporting evidence. *See Engelen v.*

21   *United States*, 68 F.3d 238, 240–41 (8th Cir. 1995)(defendant failed to establish prejudice

22   where he made "no direct assertion that he would have pled guilty if his counsel had"

23   properly advised him); *Ellzey v. United States*, 210 F.Supp.2d 1046, 1051 (C.D. Ill. 2002)

24   (counsel's failure to advise defendant to accept plea agreement did not prejudice defendant

25   absent any evidence, other than defendant's self-serving affidavit, that he would have

26   accepted plea absent counsel's advise); *Wanatee v. Ault*, 101 F.Supp.2d 1189, 1204 (N.D.

27   Iowa 2000) (to show prejudice resulting from counsel's deficient advice, petitioner must

28

1    offer more than self-serving statements; rather he must present credible, nonconclusory

2    evidence that he would have pleaded guilty had he been properly advised).

3         In his Reply, Petitioner again asserts that based on counsel's erroneous advice, "he

4    could not have made an intelligent, knowing, or voluntary choice of whether to accept or

5    reject the State's plea offer."  (docket # 18 at 99) While this allegation is relevant to

6    whether counsel's performance was deficient, it does not satisfy the prejudice prong of the

7    *Strickland* analysis.  Specifically, Petitioner does not assert that "but for counsel's error, he

8    would have pleaded guilty and would not have insisted on going to trial." *Turner*, 281 F.3d

9    at 879 (citing *Hill*, 474 U.S. at 59).

10        Finally, there is no evidence that the jury convicted Petitioner of conspiracy to

11   commit first degree murder based on solely on conditional intent.  In fact, the trial court

12   neither instructed the jury regarding conditional intent nor informed the jury that it could

13   convict based on conditional intent.  (Respondents' Exh. LL)  Rather, the trial court

14   instructed the jury regarding the statutory elements of conspiracy to commit first degree

15   murder, including the requirement that the jury find that Petitioner "caused the death of

16   another person" "with premeditation." (Respondents' Exh. MM at 6–14) The court further

17   instructed the jury that "premeditation" was defined as acting with "either the intention or

18   the knowledge that he or she will kill another human being when such intention or

19   knowledge precedes the killing by any length of time to permit reflection." (*Id.* at 9)  The

20   evidence at trial supported the jury's finding that Petitioner had specific intent to commit

21   the crime of conspiracy to commit first degree murder.  (Respondents' Exh. FF at 105–06,

22   120)

23        In summary, even assuming counsel's performance was deficient, Petitioner has not

24   established prejudice. Accordingly, he is not entitled to habeas corpus relief on his claim of

25   ineffective assistance of counsel asserted in Ground XI(A).

26   **V.  Procedural Bar**

27        As discussed above, Petitioner did not present most of his federal claims to the state

28   courts and any attempt to return to state court to present those claims  would be futile

                                    - 63 -

1    because they would be procedurally barred pursuant to Arizona law.  First, Petitioner is

2    time-barred under Arizona law from raising these claims in a successive petition for post-

3    conviction relief  because the time for filing a notice of post-conviction relief has long

4    expired. *See* Ariz.R.Crim.P. 32.1 and 32.4 (a petition for post-conviction relief must be

5    filed "within ninety days after the entry of judgment and sentence or within thirty days after

6    the issuance of the order and mandate in the direct appeal, whichever is later.")  Although

7    Rule 32.4 does not bar dilatory claims if they fall within the category of claims specified in

8    Ariz.R.Crim.P 32.1(d) through (h), Petitioner has not asserted that any of these exceptions

9    apply to him.  Moreover, a state post-conviction action is futile where it is time-barred.

10   *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002); *Moreno v. Gonzalez*, 116 F.3d 409,

11   410 (9th Cir. 1997) (recognizing untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for

12   dismissal of an Arizona petition for post-conviction relief, distinct from preclusion under

13   Rule 32.2(a)).

14           Furthermore, under Rule 32.2(a) of the Arizona Rules of Criminal Procedure, a

15   defendant is precluded from raising claims that could have been raised on direct appeal or

16   in any previous collateral proceeding. *See Krone v. Hotham*, 181 Ariz. 364, 366, 890 P.2d

17   1149, 1151 (1995) (capital defendant's early petition for post-conviction relief raised

18   limited number of issues and waived other issues that he could have then raised, but did

19   not); *State v. Curtis*, 185 Ariz. 112,113, 912 P.2d 1341, 1342 (App. 1995) ("Defendants are

20   precluded from seeking post-conviction relief on grounds that were adjudicated, or could

21   have been raised and adjudicated, in a prior appeal or prior petition for post-conviction

22   relief."); *State v. Berryman*, 178 Ariz. 617, 624, 875 P.2d 850, 857 (App. 1994)

23   (defendant's claim that his sentence had been improperly enhanced by prior conviction was

24   precluded by defendant's failure to raise issue on appeal). The aforementioned unexhausted

25   claims could have, and should have, been, properly raised either on direct appeal or on

26   post-conviction review.   Accordingly, the State court would find those procedurally barred.

27

28

**A.  Cause and Prejudice**

As set forth above, Petitioner's claims raised in Grounds I, II, III (allegations pertaining to heightened presence of law enforcement), V (allegations pertaining to the indictment itself), VI, VII, VIII, IX, X, XI(B), XII, , XIII, XIV(A), (B), (C), (D), (E); XV(A), (B), (C), (D), (E); XVI, XVII, XVIII(A), (B), XIX, XX, XXI, XXII, XXIII, XXIV are procedurally defaulted and barred from federal habeas review absent a showing of "cause and prejudice" or a "fundamental miscarriage of justice."

To establish "cause," a petitioner must establish that some objective factor external to the defense impeded his efforts to comply with the state's procedural rules. *Id.* The following objective factors may constitute cause: (1) interference by state officials, (2) a showing that the factual or legal basis for a claim was not reasonably available, or (3) constitutionally ineffective assistance of counsel. *Id.* Prejudice is actual harm resulting from the constitutional violation or error. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984). Where petitioner fails to establish cause for his procedural default, the court need not consider whether petitioner has shown actual prejudice resulting from the alleged constitutional violations. *Smith v. Murray*, 477 U.S. 527, 533 (1986).

Petitioner generally argues that he satisfies the cause and prejudice standard. (docket # 18 at 146-153) However, he does not articulate any specific basis to overcome the procedural bar. As a general matter, Petitioner's *pro se* status and ignorance of the law do not satisfy the cause standard. *Hughes v. Idaho State Bd. of Corrections*, 800 F.2d 905, 908 (9th Cir. 1986); *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988).

Additionally, to the extent Petitioner asserts that ineffective assistance of appellate counsel constitutes cause, that claim fails. Although constitutionally ineffective assistance of counsel can constitute cause for a procedural default, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray*, 477 U.S. at 486. Before an ineffective assistance of counsel claim can be considered "cause" to excuse the procedural default of another constitutional claim, the petitioner must have fairly

1   presented the ineffective assistance of counsel claim in state court as an independent claim.

2   *See Edwards v. Carpenter*, 529 U.S. 446, 451–52, 120 S. Ct. 1587 (2000) ("In other words,

3   ineffective assistance adequate to establish cause for the procedural default of some other

4   constitutional claim is itself an independent constitutional claim. And we held in *Carrier*

5   that the principles of comity and federalism that underlie our longstanding exhaustion

6   doctrine . . . require that constitutional claim, like others, to be first raised in state court.");

7   *Dellinger v. Bowen*, 301 F.3d 758, 766 (7th Cir. 2002) ("In other words, the claim of

8   ineffective assistance must be raised in state court before it can suffice on federal habeas

9   relief as 'cause' to excuse the default of another claim [even if that other claim is also

10  ineffective assistance of counsel]. If the second claim of ineffective assistance is itself

11  defaulted, the petitioner will be fully defaulted."); *Oken v. Corcoran*, 220 F.3d 259, 265

12  (4th Cir. 2000) (ineffectiveness of appellate counsel could not serve as cause for

13  procedurally-defaulted claim because petitioner never raised ineffectiveness claim in

14  Maryland court); *Carrier*, 477 U.S. at 489.

15          The record reflects that Petitioner did not properly exhaust in state court a claim that

16  appellate counsel was ineffective for failing to properly raise his claims on direct appeal.

17  Therefore, any deficiency in counsels' representation cannot excuse Petitioner's procedural

18  default on these claims.

19          Similarly, Petitioner cannot establish cause by blaming post-conviction counsel for

20  failing to raise his claims on post-conviction review, because "the right to counsel does not

21  extend to state collateral proceedings." *Martinez-Villareal*, 80 F.3d at 1306; *see also*

22  *Coleman*, 501 U.S. at 752–53; *Murray v. Giarrantano*, 492 U.S. 1, 7-12 (1989)(the

23  Constitution does not require states to provide counsel in post-conviction proceedings);

24  *Pennsylvania v. Finley*, 481 U.S. 551, 555, 1993 (1987).  When a petitioner has no

25  constitutional right to counsel, there can be no constitutional violation arising out of

26  ineffective assistance of counsel.  *Coleman*, 501 U.S. at 752.   In view of the foregoing, a

27  claim of ineffective assistance of post-conviction counsel does not constitute cause to

28  excuse Petitioner's procedural default.  *See, Martinez-Villareal*, 80 F.3d at 1306.

1    In summary, Petitioner offers no legitimate "cause" which precluded him from

2   properly exhausting his state remedies.  Accordingly, the Court declines to reach the issue

3   of prejudice.  *Engle*, 456 U.S. at 134 n. 43.

4         **B.  Fundamental Miscarriage of Justice**

5         Petitioner further argues that failure to consider his claims will result in a

6   fundamental miscarriage of justice. A federal court may review the merits of a procedurally

7   defaulted habeas claim if the petitioner demonstrates that failure to consider the merits of

8   his claim will result in a "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S.

9   298, 327 (1995).  A "fundamental miscarriage of justice" occurs when a constitutional

10  violation has probably resulted in the conviction of one who is actually innocent.  *Id.*

11        This gateway "actual innocence" claim differs from a substantive actual innocence

12  claim.  *Smith v. Baldwin*, 466 F.3d 805, 811-12 (9th Cir. 2006).  The Supreme Court

13  described the gateway showing in *Schlup*, 513 U.S. at 315-16, as a less stringent standard

14  than a substantive claim of actual innocence. *See also Carriger v. Stewart*, 132 F.3d 463,

15  476 (9th Cir. 1997)(suggesting that a "habeas petitioner asserting a freestanding innocence

16  claim must go beyond demonstrating doubt about his guilt and must affirmatively prove

17  that he is innocent.").  If Petitioner passes through the *Schlup* gateway, the court is only

18  permitted to review his underlying constitutional claims.  *Smith*, 466 F.3d at 807.  The

19  fundamental miscarriage of justice exception applies only to a "narrow class of cases" in

20  which a petitioner makes the extraordinary showing that an innocent person was probably

21  convicted due to a constitutional violation.  *Schlup v. Delo*, 513 U.S. 298, 231 (1995).  To

22  demonstrate a fundamental miscarriage of justice, Petitioner must show that "a

23  constitutional violation has resulted in the conviction of one who is actually innocent."

24  *Schlup*, 513 U.S. at 327.  To establish the requisite probability, Petitioner must prove with

25  new reliable evidence that "it is more likely than not that no reasonable juror would have

26  found petitioner guilty beyond a reasonable doubt."  *Schlup*, 513 U.S. at 324, 327.  New

27  evidence presented in support of a fundamental miscarriage of justice may include

28  "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical

- 67 -

1   evidence that was not presented at trial." *Id.* at 324, *see also, House v. Bell*, 547 U.S. 518

2   (2006)(stating that a fundamental miscarriage of justice contention must involve evidence

3   that the trial jury did not have before it).

4        Although Petitioner asserts that failure to consider his claims will result in a

5   fundamental miscarriage of justice, he has not established that, in light of newly discovered

6   evidence, "it is more likely than not that no reasonable juror would have found petitioner

7   guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 324, 327.

8   **VI.  Conclusion**

9        In view of the foregoing, the Petition for Writ of Habeas Corpus should be denied.

10   Accordingly,

11        **IT IS HEREBY RECOMMENDED** that Petitioner's Petition for Writ of Habeas

12   Corpus (docket # 1) be **DENIED**.

13        This recommendation is not immediately appealable to the Ninth Circuit

14   Court of Appeals.  Any notice of appeal pursuant to Federal Rules of Appellate Procedure

15   4(a)(1), should not be filed until the District Court enters judgment.  The parties shall have

16   ten days from the date of service of a copy of this recommendation within which to file

17   specific written objections with the Court.  *See*, 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72,

18   6(a), 6(e).  Thereafter, the parties have ten days within which to file a response to the

19   objections.  Failure timely to file objections to the Report and Recommendation may result

20   in the acceptance of the Report and Recommendation by the District Court without further

21   review.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure

22   timely to file objections to any factual determinations of the Magistrate Judge will be

23   considered a waiver of a party's right to appellate review of the findings of fact in an order

24   or judgment entered pursuant to the Magistrate Judge's recommendation. Fed.R.Civ.P. 72.

25        DATED this 22nd day of July, 2008.

26

27                          Lawrence O. Anderson

28                          United States Magistrate Judge

- 68 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28